### E. I. DUPONT DE NEMOURS & CO., Inc., v. AMERICAN HAWAIIAN S. S. CO.

### No. 19619–K.

District Court, N. D. California,. S. D.

Feb. 5, 1930.

Sawyer & Cluff, of San Francisco, Cal., for libelants.

Andros, Hengstler & Dorr, of San Francisco, Cal., for respondent.

KERRIGAN, District Judge.

The essential question in this case is whether due diligence was used in inspecting the top of double bottom tank No. 5 of the steamship Columbian at Boston when hold No. 3 was clear of cargo. After the call of the vessel at Boston cargo was loaded in hold No. 3, and the Columbian proceeded to the West Coast. At Boston tank No. 5 was full of fuel oil. At the Panama Canal this oil was pumped out and into the deep tank for use. At San. Pedro the deep bottom tank, No. 5, was refilled, and as it filled oil leaked out through a rivet hole, causing the damage to cargo made a basis of this libel.

The Columbian passed a special Lloyd's survey in October, 1925. In June, 1926, double bottom tank No. 5 received a special Lloyd's test following a grounding of the vessel. The vessel was at Boston, with holds empty, preparing for her westward run in September, 1927.

At that time the chief officer and the engineer (a relief officer serving during the vacation of the regular chief engineer) inspected No. 3 hold and the top of tank No. 5. The top of this tank is virtually the floor of the hold. Stringers are laid upon the steel tank top, and on top of the stringers are placed planks serving as the floor upon which, several layers of dunnage intervening, cargo is stowed. There is a sump at each end of the tank into which any leakage from the hold or tank top drains.

The inspection made at Boston was visual. It was physically possible to put this tank under pressure by running oil from the deep fuel tank of the vessel into tank No. 5. This was not done. It is upon this failure to use a pressure test that libelants chiefly rely.

The visual inspection made included taking up planks at intervals over the tank top and at the sumps, and examining the tank for signs of leakage with the aid of a flashlight. Despite certain conflicts in the testimony of the two officers as to the number and location of the planks raised, I am satisfied that the inspection made was sufficient to show, from the absence of oil in the sumps and the absence of leakage signs on the tank top, that the tank was not then leaking. The inspection disclosed nothing to put the officers of the ship on notice as to any faulty condition of the tank.

It must be remembered in this connection that tank No. 5 was full of oil; that it had been subjected to two Lloyd's surveys within the preceding two years; that the filling of the tank at San Pedro, prior to this voyage, and the expansion of oil due to heat on the eastbound trip through the Panama Canal created at least sufficient pressure on this tank to search out an existing leak of the size of a large rivet hole; and that, as testified, "a rivet may pop out at any time." Taking all of those facts into consideration, I am satisfied that a visual inspection of tank No. 5 constituted due diligence in determining its seaworthiness. The owners of the vessel cannot be held to be bound to apply a pressure test to all fuel tanks of a vessel prior to the commencement of a voyage, under these circumstances, and in the absence of facts putting them on notice of leakage.

It is urged by libelants that the fact that the regular chief engineer noted that the

sumps were "full of oil" when he returned to the vessel at New York after the inspection had been made at Boston is evidence that that inspection was inadequate, and that frequent log entries as to pumping the sumps of tank No. 5 between New York and the Panama Canal are further proof of a leaky tank not discovered at Boston. On the other hand, a similar argument after the fact supports respondent, in that it appears that had this rivet hole been open between New York and Panama, with tank No. 5 full of oil, the cargo would have been covered with oil prior to arrival at San Pedro, which is not the case. I believe that these log entries are correctly explained by the testimony of the chief engineer that the relieving engineer did not understand the operation of the pumps, so that water and oil drainage accumulated between Boston and New York, and that after that time there was some trouble with the strainers requiring fairly frequent pumping.

Under all of these facts, I am satisfied that due diligence was used to secure the seaworthiness of the steamship Columbian, and that a decree should be entered for respondent with costs.