### THE JOSEPHINE.

### TEXAS CO. (SOUTH AMERICA), Limited, et al. v. CUMMINS et al.

### No. 4408.

Circuit Court of Appeals, Third Circuit.

April 6, 1931.

Acker, Manning & Brown, of Philadelphia, Pa., and Bigham, Englar, Jones & Houston and Oscar R. Houston, all of New York City, for appellants.

Howard M. Long, of Philadelphia, Pa., and Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Roscoe H. Hupper and William J. Dean, both of New York City, of counsel), for appellees.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMPSON, District Judge.

WOOLLEY, Circuit Judge.

The Schooner "Josephine," having sailed from Port Arthur, Texas, arrived at Pernambuco, Brazil, her port of destination, long overdue with her cargo damaged by water taken aboard during heavy weather. The Texas Company, the ostensible owner of the cargo and party to the charter, filed a libel in rem for damages. Although The Texas Company (South America) Limited, an affiliated corporation, intervened as the real party injured, we shall, for convenience, speak of the cargo owner as the libellant.

The case was tried on an issue of law arising from the owner's warranty of the schooner's seaworthiness and on a corresponding issue of fact. The District Court, finding her seaworthy, entered a decree dismissing the libel. The libellant appealed.

Before coming to the facts we pause to make certain the issue raised by the pleadings and briefly to examine the applicable law.

The cargo owner avers in its libel that in December 1917 it entered into a charter party whereby the shipowner agreed to let and the libellant agreed to hire the schooner for transportation of petroleum products on a voyage between the ports stated; that early

in April 1918, the libellant put aboard the schooner, then lying at Port Arthur, Texas, the agreed cargo in good order and condition; that on April 13 she sailed and after a voyage of four months reached her port of destination and delivered the cargo not in the good order and condition in which it was shipped but damaged through negligence of the schooner in respect to loading, stowage, custody and care, and through her unseaworthiness. As the issue raised by the libellant's averment of negligence in loading, stowage, etc. was not separately pressed at the trial, the pertinent part of the schooner's answer may be limited to the owner's traverse of the libellant's averment of her unseaworthiness and to his reply that he had used due diligence and ordinary care to make the schooner seaworthy in all respects and that at the time of sailing she was seaworthy and was properly manned, equipped and supplied for the voyage, and that any damage sustained by the cargo was not caused or contributed to by any fault on his part but was occasioned by perils of the sea which were excepted in the charter party and bill of lading.

█ Thus it is clear from the pleadings that the libellant relies for its law upon the owner's express warranty in the charter party as to seaworthiness, namely, that the schooner was "tight, staunch, strong, and in every way fitted for the voyage." The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 825, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; The Lockport (D. C.) 197 F. 213. The owner however pleads the Harter Act (27 Stat. 445 [46 USCA §§ 190–195]) which makes no change in his duty under the warranty to furnish a seaworthy vessel, The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181; The Cornelia (D. C.) 15 F.(2d) 245, but does modify liability to the extent that if he used diligence to see that the vessel was seaworthy he and his vessel are exempt from liability for loss arising from various causes—among them perils of the sea. The Fort Gaines (D. C.) 21 F.(2d) 865; Id. (D. C.) 24 F.(2d) 849, affirmed Federal Forwarding Co. v. Lanasa (C. C. A.) 32 F.(2d) 154; The Agwimoon (D. C.) 24 F.(2d) 864; affirmed Atlantic Gulf & West Indies S. S. Lines v. Interocean Oil Co. (C. C. A.) 31 F.(2d) 1006, distinguished. The distinction between due diligence imposed upon an owner by the Harter Act and his relief from liability on the one hand and the owner's duty and liability under his general warranty of seaworthiness on the other hand need not be discussed in this case because the evidence bears equally upon the question of due diligence and the question of seaworthiness. And so evidently thought the proctors for the opposing parties, for both looked upon the schooner's seaworthiness as the center of the case and each voluntarily, and at once, assumed the burden of proving the opposite of the issue, respectively. This, however, does not relieve the respondent owner of his burden of proving the seaworthiness of his schooner, or of proving the exercise of due diligence in making her seaworthy as a prerequisite to availing himself of the liberality of the Harter Act, by showing that damage to the cargo arose from one of the exceptions in the charter party, The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748, which, as pleaded in this case, is perils of the sea. The Cornelia, supra. Therefore the first question, (and, it may be, the only one), is that of the schooner's seaworthiness under the warranty. In considering this question we shall follow the voyage through the evidence in order to determine the schooner's condition at the start and her condition at sea in view of the perils she encountered.

█ As a warranty of seaworthiness must be construed as requiring the vessel to be seaworthy when she sails, Federal Forwarding Co. v. Lanasa (The Fort Gaines) 32 F.(2d) 154 (C. C. A.); Luckenbach v. McCahan Sugar Co., 248 U. S. 139, 150, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522, the first question of fact bears on the condition of the schooner when she put to sea.

█ The "Josephine" was a wooden craft of about 940 gross tons, originally built with barkentine rigging but later changed to a four mast schooner. She was launched in 1896. Advancing in age, she was in 1916 stiffened by placing heavy top sister keelsons along her entire length and heavy turnbuckle rods athwartship. Nevertheless she was in 1917 hogged to the extent of fourteen inches.

From December 1915 to March 1918, a period of twenty-eight months, the "Josephine" was repaired four times at a cost of $17,500, of which $1,742 was expended upon her late in 1917. These facts and figures were used by the libellant as proof of the schooner's bad condition and were relied upon by the owner as evidence of her good condition and of his diligence in making and keeping her seaworthy. To fortify its interpretation of these figures the libellant produced two witnesses who had surveyed the schooner in 1919—nine months after she had sailed from Texas on the voyage in question and two

months after she had grounded on a later voyage. They testified that the condition of her hull was bad and gave their opinion that judging from what they saw when they examined her in January 1919 she must have been unseaworthy when she sailed on the voyage in April 1918. Against this opinion evidence by relation back to the critical time of departure there was direct evidence for the owner which showed that the schooner was under repairs at Mobile late in 1917 and after their completion she was reclassed by the American Bureau of Shipping as A 1½ for a six year period, the highest class for a schooner of her age; and there was testimony by the surveyor for the bureau that he examined the schooner in the dock at Mobile and made a report on March 29, 1918, specific as to details, and concluding: "Ship in good condition, this has been endorsed on her Class Certificate." He also testified that at the time of his certificate she was seaworthy and in condition to take the cargo on the chartered voyage. Two weeks later she sailed.

True, the schooner was old, but age alone is not evidence of unseaworthiness. A wooden ship may be old and still be fit.

Finding the schooner seaworthy at the inception of the voyage, the next question is, did she afterward become unseaworthy at a time and under circumstances which rendered the owner by due diligence capable of reconditioning her?

Sailing from Port Arthur, Texas, on April 13 the schooner's troubles began the very next day when, encountering high winds in the Gulf of Mexico, she began to lose her sails. The winds increased to hurricane force until by April 19 she had been practically stripped of her sails. She then put about and staggered back to the coast, arriving at Galveston on April 23, where she laid by awaiting new sails. There is no evidence that in this experience the hull of the schooner had become unseaworthy. Indeed, no one seems to have thought anything about it; at least there is no evidence that she leaked during the gulf storm, or that loose planking or loose caulking was discovered after her return to port or that, except her sails, any repairs were needed or made, or that her cargo had been damaged. So, we find that when starting on her voyage a second time she was seaworthy.

■■ Having received her sails, the schooner made her second start on May 15 and proceeded through the Gulf without incident. But on June 21, when in the Atlantic Ocean, she encountered another storm rising to the force of a gale or hurricane. Again the schooner lost her sails. During seven days of pounding, she shipped much water, her deck seams and butts opened and let water into the hold, the steam pump refused to work for a time and the hand pumps did not keep the water from the cargo, with the result that it suffered the damage of which the libellant complains.

Having found from the evidence that the schooner was seaworthy when first she sailed and, from the same evidence confirmed by the fact that she weathered the gulf storm without known strain, that she was staunch and strong when next she put to sea, it is evident the behavior of her hull in the ocean storm arose from something which occurred after she was well on her voyage. There is no evidence that anything had happened before the storm which contributed to the damage to the ship and her cargo. It follows that it must have been the storm to which the hull yielded. Was, therefore, the storm a "peril of the sea" within the exception of the charter party? This is always a troublesome question because a peril of the sea is not susceptible of a satisfactory, or comprehensive, definition. A storm may or may not be such a peril. The test, however, seems to be—at least it is the one we shall apply in this instance—that when a storm is of such unusual violence that it cannot reasonably be anticipated and avoided or cannot be resisted by ordinary exertions of skill and prudence and when it has caused unusual and unexpected damage to the hull of a seaworthy vessel resulting in damage to her cargo, the loss may fairly be attributed to a peril of the sea and falls within the exception of the charter party. The Warren Adams (C. C. A.) 74 F. 413; Id., 163 U. S. 679, 16 S. Ct. 1199, 41 L. Ed. 316; The Frey (C. C. A.) 106 F. 319; The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Newport News (D. C.) 199 F. 968; 24 R. C. L. 1314. And such we are constrained to hold was the case in this marine disaster.

■■ But the owner's warranty of seaworthiness extends to the ship's equipment and the owner's duty to make her seaworthy also extends to her equipment. This rule, clearly recognized by the parties, appears in the averments of both the libel and answer. Of her equipment that did not withstand the ocean storm were her sails. As most of these were new when she encountered that storm we imagine the libellant does not hopefully charge unseaworthiness or negligence in respect to them. It does, however, very earnestly charge unseaworthiness in respect to the

steam pump, a vital part of a ship's equipment, saying that, "At no time on the voyage could the steam pump be made to work."

So, as in case of the hull, we must examine the pump at the inception of the voyage and at the time of the storm.

There is no evidence as to the condition of the steam pump on April 13 when the schooner first put to sea other than the favorable inference from the survey and classification made by the American Bureau of Shipping immediately before and testimony as to her seaworthiness in general. Entries in the ship's log on four days before and during the gulf storm show "Lights and pumps attended to." There are no entries or other evidence that the steam pump would not work during the gulf storm or after the schooner returned to port. It is fair to assume that on her second start the pump was in the condition the log seems to have recorded.

On the first day of the ocean storm the log shows: "Steam pump broke down." It also discloses that on June 22, 23, 24, 27, 28 and 29 the crew worked the hand pumps. The log does not reveal when, if ever, the steam pump was repaired. In the master's protest, however, there is an entry: "Steam pump failed to work and vessel's pumps were worked by hand until repairs were made on steam pump." This contradicts to some extent the libellant's statement that "At no time on the voyage could the steam pump be made to work." That statement is also contradicted by the cook who testified that the steam pump "choked and they cleared it."

"Q. How long did it take to clear it? A. Didn't take long, about an hour or two, and it was clear.

"Q. Then did your steam pump operate on the voyage after that? A. Yes, sir; our steam pump operates all times. It would be ninety days, God knows where we would have been if the pump wasn't going."

Yet, truly, her steam pump did not work for a time. This was because of a defect in equipment which so far as the record shows was not there before the storm. What caused it? In the absence of evidence indicating any other probable cause we must hold it was the storm. Being violent enough to rip the sails and damage the hull we are constrained to hold that it was, equally in respect to the pump, a peril of the sea within the exception of the charter party.

The decree of the court dismissing the libel is affirmed.