### THE FLORIDIAN.

ROBERT BRINING & CO., Limited, et al.
v. STRACHAN'S SOUTHERN S. S. CO.
No. 392.

Circuit Court of Appeals, Second Circuit.
June 1, 1936.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, of counsel), for appellees.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

On February 20 and 21, 1929, at Jacksonville, Fla., and at Savannah, Ga., on February 26, 1929, shipments of citrus fruits, celery, and cabbage were loaded on board the steamship Floridian to be carried to London, England. After sailing March 2, 1929, the vessel ran into heavy weather when a few days out of Savannah. Her steering chains parted in a number of places during this weather and the fair-lead in the shelter deck space carried away, ripping out a section of the bulkhead. The heavy seas broke over the poop deck and smashed the hand steering gear. Continued difficulty caused the vessel to put into Halifax for repairs. After a delay of nine days while a new chain was installed and other repairs made, she again sailed on her voyage, arriving in England April 1, 1929. On discharging the cargo it was found that it was very considerably damaged by decay.

The bills of lading for the damaged goods had acknowledged receipt of the cargoes in good order and condition and contained the following exceptions: "Detention, delay, * * * or any latent defect in hull, machinery or appurtenances; or unseaworthiness of the vessel even existing at the time of shipment or sailing on the voyage, providing the owners have exercised due diligence to make the vessel seaworthy * * * decay, putrefaction, change of character * * * or any loss or damage arising from inherent vice, defect or nature of the goods."

The court below found that there was no fault or negligence by the vessel owner in handling the refrigeration machinery or ventilation of the refrigerated compartments, but that the decay found at the port of arrival was principally due to inherent vice and the nature of the goods. Furthermore, he found that the decay "was not accelerated by any fault in the care and custody of the cargo." However, he found that the vessel was not seaworthy and that this had allowed water to get into Nos. 2 and 4 compartments and had caused the nine-day delay, due to breakdown of the steering gear. He held that the steering gear gave way in expectable weather and that this established that there had not been due diligence to make the ship seaworthy.

The Floridian had been laid up for several years before it was purchased from the United States Shipping Board in 1928. It was taken to a well-known and responsible ship repair yard and underwent extensive repairs under the supervision of a naval architect and of a representative of the American Bureau of Shipping. After repairs, the vessel was given a seaworthy certificate as to hull and machinery, and a classification certificate. These certificates, except the classification, were refused admission in evidence.

The ship's steering engine was in the shelter deck space. There were two drums, one on the port side and the other on the starboard side, to each of which was attached a chain which ran from the drum athwartship around a fair-lead and aft through the shelter deck bulkhead along the deck and under a roller on the well deck up to the poop deck and over a roller on the poop deck and thence to the quadrant. There were three lengths of chain on each side, one extending from the drum to a point on the well deck, where a turn buckle joined it with the second chain which ran to the poop deck, where a buffer spring was placed between it and the third chain.

There is uncontradicted evidence that this steering transmission gear was overhauled and put in good order. The classification granted to the vessel by the Bureau showed her to be in seaworthy condition and fit to retain her class after the reconditioning. At the dock the steering chains were taken apart, annealed according to the practice to renew their toughness, closely examined, and all defective links renewed. All the pins holding fair-leads were examined and replaced where it appeared advisable. The specifications given to the repair company detailed a close check and repair of the chains and it was established that the directions were carefully carried out. The assistant superintendent of the repair company in charge,

the naval architect's representative, the Floridian's captain, chief officer, and assistant engineer, all testified in some detail to the repair of the steering gear. It appears that the chains were not only tested for cracks with a hammer, but that an actual test of the whole gear was made at the dock. A full head of steam was put on the steering engine and for some time the rudder was put hard over to either side. This put a good strain on the chain and seems to be the most thorough test possible aside from actual use in very bad weather. To require that would be to read the "due diligence" clause out of the bill of lading and we think the trial court erred in its pragmatic test of due diligence. From the mere breakage there is no evidence indicating negligence of the appellant to deprive it of the exceptions of the bills of lading. If competent men considered the vessel seaworthy, after an inspection, with full knowledge of repairs made, it indicated that due diligence had been used in preparation for the expectable tests and strains of her voyage, and the vessel owner was justified in believing her fit for the voyage. Any damages to the vessel later must be regarded, particularly in heavy seas, as resulting without fault on the part of the owner.

No evidence is presented pointing out that the owner left undone anything which he could have done to make the vessel seaworthy. There is a suggestion by the court below that new steering chains might have been installed, but the vessel owner was justified in accepting the opinion of a competent repair company which recommended and made repairs to the chains as above stated. The annealing of the chain softens them and brings back their original toughness. The replacing of worn and defective parts and testing each link, as was done, constituted that degree of care expected of a ship owner and brings the damage within the terms of the bill of lading.

As to the water in Nos. 2 and 4 compartments, the evidence does not show how the water got into these compartments. It is supposed that it leaked in around either the temperature pipes or the old temperature pipes which had been blanked off. It is not clear as to whether it leaked from the main deck around these temperature pipes or whether it leaked in where the shelter deck bulkhead was torn off when the pin holding the fair-lead in the shelter deck space parted during the heavy weather. An inspection of these pipes before sailing had showed them to be water tight. Care had been taken during the reconditioning to see that the old pipes were snugly plugged. There are no grounds for inferring that this part of the reconditioning job was not performed with due diligence.

All the work of reconditioning the ship was done at a responsible shipyard under the advice of a competent naval officer. This was due diligence. The Anaconda, 60 F.(2d) 898 (C.C.A.2); The Josephine, 49 F.(2d) 207 (C.C.A.3); The Emilia, 13 F.Supp. 7 (D.C.S.D.N.Y.); E. I. Dupont de Nemours & Co. v. American Hawaiian S. S. Co., 41 F.(2d) 226 (D.C.N.D.Cal.); The Cameronia, 38 F.(2d) 522 (D.C.E.D. N.Y.).

Since the damage to the cargo falls within the bill of lading exceptions, the appellee cannot recover its cargo damage.

Decree reversed.