**EPPENS, SMITH CO., Inc., v. SILVER LINE, Limited.**

No. 419.

District Court, E. D. Louisiana, New Orleans Division.

March 10, 1941.

Deutsch & Kerrigan, of New Orleans, La., for plaintiff.

Denegre, Leovy & Chaffe and Lloyd A. Ray, all of New Orleans, La., for defendant.

CAILLOUET, District Judge.

Five hundred and forty-one chests of tea, in apparent good order and condition, were received for carriage and delivery by respondent's motorship Silverteak from Batavia, Java, to New York, where delivery was actually made on February 9, 1939; with nine chests found damaged by shipsweat, as the stipulation of the parties, dated April 26, 1930, establishes.

Whilst the libel therein seeks to recover $250 as compensatory damages, paragraph 8 of such stipulation provides that proof as to the extent of the damage actually done to the tea shall await judicial determination of liability vel non.

The two bills of lading covering such tea shipment, which left Batavia on December 16, 1938, and travelled to Dakar, Africa, Halifax, Nova Scotia, Boston, Mass., to New York, specifically exempted the carrier vessel and its owner for any loss or damage occasioned by perils of the sea and sweat, not to mention several other excepted causes therein listed.

The libelant took the testimony of no one, resting its case upon the aforementioned stipulation and the cross-examination of the Silverteak's first and second officers, in connection wherewith it offered in evidence the vessel's two scrap logs.

As to the seaworthiness of the Silverteak, it was proved that it enjoys a 100 A–1 rating at Lloyds'; the testimony on that score fits in with what was admitted (by another stipulation which is hereinafter referred to) would have been the testimony of the vessel's master had he also been present and testifying on the subject.

Libelant contends that there was negligence on the part of the vessel in stowing the tea and in failing to properly ventilate, which accounts for the shipsweat damage to the nine chests in question.

The burden rests upon libelant to establish the claimed negligence by the preponderance of evidence. Clark v. Barnwell, 1851, 53 U.S. 272, 12 How. 272, 13 L.Ed. 985; The Cherca, D.C.E.D.N.Y.1931, 52 F. 2d 646; The Tergestea, D.C.S.D.N.Y.1931, 54 F.2d 809; Thespis and Swinburne, D.C. S.D.N.Y.1931;[1] The Hog Island, 2 Cir., 1931, 48 F.2d 101; The Josephine, 3 Cir., 1931, 49 F.2d 207; The Maryland, D.C.S. D.N.Y.1937, 19 F.Supp. 505.

The record satisfactorily establishes the fact that the tea in question was stowed in the vessel's No. 1 'tween-decks stowage compartment, along with sundry other cargo items, including tea.

By another stipulation of the parties, dated July 16, 1940, there appears sufficient explanation why the testimony of Captain Frederick Henderson, master of the Silverteak, was not taken; and it is stipulated that had he been called as a witness, he would have testified, amongst other things, as to his proper qualification and experience as a licensed master of all tonnages on all seas, that the Silverteak was entirely seaworthy, properly manned, equipped and supplied, prior to her departure from Batavia, that she had four ventilators leading into No. 1 'tween-decks stowage compartment— two on the forecastle head and two on the main (properly "upper") deck—and that the custody of the cargo was primarily entrusted to the vessel's second officer.

John C. Cooke, holder of a Board of Trade Certificate as a steamship master, and the Silverteak's first officer, came aboard as such on January 1, 1939, at Colombo, Ceylon, when the ship was already fully loaded. He saw none of the stored cargo while the vessel was on the way; never entered the 'tween-decks stowage compartment, but did examine the hatch coamings around the "top decks" for moisture, whenever the hatches were opened; and on the vessel's docking at Halifax, he noted sweat on the inside of the hatch coamings and "around underneath the deck". Going into the ship's hold during the discharge of the local Halifax cargo, he then noticed some cases of tea dislodged in the No. 1 'tween-decks stowage compart-

[1] No opinion for publication.

ment, and lying in the square of the hatchway; which dislodgment, he said, had been occasioned by heavy seas. There is no proof, however, that these dislodged chests were the nine damaged by shipsweat, though they were actually located below the open hatch, on the coaming of which, as on the underside of the deck, moisture had accumulated; but, the witness admitted, the actual dislodgment of the chests did give greater opportunity for their being damaged by sweat.

He had no knowledge as to how the tea had been stowed, and there was nothing out of the ordinary to cause him to pay particular attention to such tea, during its discharge at New York; he was under the impression that, as chief officer and charged with that duty, he signed for one or two cases that had been damaged by sweat or other water.

This witness testified that all ventilators were properly trimmed, and all hatch covers were removed for added ventilation of the cargo, whenever weather permitted, but he insisted that the ventilators were so trimmed only "back to wind", with the cowls never facing the wind; he also maintained that there were but two, and not four, ventilators to the No. 1 'tween-decks stowage compartment; which were both located at the after end.

George Armatage, the vessel's second officer, and in immediate supervision of the stowage and care of the cargo, who had occasion, as he said, to go into holds before loading, while loading, before discharge, after discharge, and while the vessel was repairing, however, definitely testified that there were four ventilators to the No. 1 'tween-decks hold, and that the ventilators were always trimmed cowls to the wind "on and off", meaning by that statement, "one on the wind and one off", the lee ventilator, fore and aft, to the wind, and the weather ventilators "always back to the wind." N. of E. p. 59.

In Captain R. E. Thomas' work on "Stowage" (Glasgow, 1937 Reprint), at page 32, this procedure is approved, in the following language, viz: "* * * the ventilation of holds is best effected when the weathermost cowls (forward cowls with wind ahead or on bows, port cowls with wind on port side and vice versa) are kept back to wind and the leemost on the wind, * * *".

As already noted, it is stipulated that had the master testified, he would have cor-

roborated the second officer as to the number of the particular ventilators at issue.

Armatage's testimony as to the ventilation of the cargo holds is in agreement with that of the First Officer Cooke. He says that on the voyage from Batavia to New York the holds were ventilated every day "when it was practicable" by opening the hatches and using the ventilators.

The usual procedure followed, he said, is: hatches open, if the vessel is not shipping seas and the weather not rainy, and ventilators open; if hatches closed, ventilators still open until, because of rainy weather or heavy seas, the cowls are covered, or, if it becomes necessary to protect them against damage or destruction by pounding waves, the ventilators are unshipped.

The vessel's scrap logs show that after leaving Batavia, Java, for Colombo, Ceylon, it spent no less than half of the intervening time between December 16th and January 1st, in some four or five ports, engaged in taking on cargo; and that while on the way, hatches were opened for ventilation when the weather permitted, there having been considerable rain at sea; the ventilator cowls at no time being reported covered, however.

The vessel's hatches were open every day, from the time it left Colombo, Ceylon, where First Officer Cooke came aboard on January 1st, until through January 27th; on the 28th, the scrap log registering a heavy roll and pitching and the shipping of water over all, no mention appears of either hatches or ventilators; on the 29th, the heavy seas having progressively increased, it is noted that "all hold ventilators covered"; a like weather condition and a like covering on the 30th. In the early morning of the 31st, with "wind and sea moderating; vessel pitching and rolling to heavy swell" the ventilator covers were removed. At 9 o'clock the hatches were "opened for ventilation." At or about noon, the sea was more turbulent, "shipping spray over all", and the log recording the fact that at 2 P. M. the hatches were "securely battened down; Nos. 1 and 2 securely lashed"; it is reasonable to assume that the hatch covers were replaced when the vessel began shipping spray, as aforesaid, and that, thereafter, it became necessary to make them more secure because of the increased rolling and pitching of the vessel; all the while, the ventilators (which First Officer Cooke testified stand to a height of 8 to 9

feet above the deck surface) were open for ventilation of the cargo; the log entry at 6 P. M. being to the effect that a "high confused sea" was then running and that all hold ventilators were then covered; which covering is done by fitting a canvas cover over the "mouth" of the cowl (Cooke testimony, p. 7).

On February 1st, with a "whole gale" blowing and the vessel "labouring very heavily" in "mountainous seas and very heavy swell", shipping seas fore and aft and beset by "hurricane rain squalls", the forward ventilators were unshipped; the vessel shipped a "very heavy sea", and damage was thereby done on the forepart of the lower bridge.

On the following day, the vessel proceeded at half speed throughout the day until 5 P. M., still contending against a whole gale and hurricane rain squalls the greater part of the day, "rolling, pitching, labouring and plunging very heavily" in "mountainous sea and very heavy swell" and "shipping very heavy seas over all". The log records sundry items of damage suffered on this day; i. e., lifeboat ladder, lifebuoy rack and lifeboat covers, washed away, lifeboat chocks broken, awning stanchions and boat rail bent, lifebuoy rack smashed, and teakwood on forepart of the lower bridge, stoved in.

On February 3rd, when the weather conditions recorded evidenced considerable moderation, though a "rough sea" and "moderate swell" was still "shipping spray over all", it was recorded, additionally, that the cowl on the ship's funnel "had suffered greatly" and appeared "to be in danger of carrying away", and that a fresh water filling pipe to top bridge tank was split.

On the 4th, the pilot came aboard out of Halifax, with the weather calm, and upon docking of the Silverteak, discharge of cargo from its hatches 1 and 2 began at 9 A. M.; discharging from No. 1 ended by 4 P. M. The day closed fine and clear, with occasional snow.

The log records the fact of inspection in port, and it is noted, particularly, that "all wooden hatch covers were in good condition and well-fitting", and that the "weather deck hatches were battened down with three good tarpaulins and securely wedged".

There is no mention of the re-installation of the ventilators "unshipped" on the 1st, but First Officer Cooke testified that they were replaced "when we got into port" and

Second Officer Armatage swore that they were again in place at the time of the vessel's departure from Halifax.

In the early afternoon of February 5th, cargo items for Halifax being all discharged, the Silverteak was on its way to Boston, with a moderate beam sea, and the weather fine and clear; the log readings thereafter changing to "slight sea, mainly cloudy and clear". No opening of hatches for ventilation, nor closing of ventilators, recorded.

The vessel docked at Boston, at 9 o'clock on the morning of February 7th, and discharge of local cargo took place, including some items from hold No. 1.

Out of Boston at 9 P. M. on the 8th, the log reads "rolling & pitching easily to E. N. E. swell, cloudy and clear", changing to "slight sea, cloudy and clear".

By 10 A. M. on the 9th, the Silverteak was discharging its cargo at New York, the voyage completed; that day closing "calm, cloudy and clear".

Second Officer Armatage, the vessel's cargo officer, testified that tea is usually given a 'tween-decks stowage, because that is, as a rule, the ship's driest stowage and that, with sufficient tea to justify, it is preferable to stow tea alone in a compartment. With reference to the particular shipment to libelant, the space utilized in No. 1 'tween-decks hold for tea stowage was the smallest space available for loading all tea shipments carried on the voyage.

He described the customary way of tea stowage and remembered the actual tea stowage done on this voyage, although he, as a matter of course, did not remember libelant's tea as distinguished from any other so stowed. The cargo plan, made by him as cargo officer and filed in evidence, shows the location, in No. 1 'tween-decks hold, of all tea shipments.

Over the battens bolted to the ship's frame, dunnage is set vertically, said the witness, and such dunnage (planks 8 inches to a foot wide by 1 inch in thickness) is covered with matting; the tea chests are pressed and stacked against the matting-covered dunnage, which is intended to act as a protecting shield against moisture from the steel ship frame; and over the top of the stacked tea chests matting is placed, to protect the shipment from dripping ship-sweat. Matting is also wrapped, for the same reason, around the ventilator tubes, against which tea is stowed.

Shipsweat, he further testified, is general throughout a hatch—more, however, is to be found around the hatch coaming. The hatch coaming, in the case of a vessel like the Silverteak, is on the upper deck, and coming down the hatch one passes through the shelter deck compartment into the 'tween-decks space below. No tea was stowed beneath hatch coamings. He found no unusual condition on descending into No. 1 'tween-decks hold at New York, after its cargo had been fully discharged; there was sweat, which, however, was more noticeable "on the hatch that had been opened" than was actually to be seen in the hold. N. of E. pp. 56, 44, 53. At Halifax, the heaviest sweat was "mostly around the hatch coaming", said First Officer Cooke (N. of E. pp. 23, 27), who testified as follows (p. 22) : "A. You can not get down in the hold on the 'tween-decks on a voyage like that, because the shelter deck would be full of cargo, too; but we do inspect the hatch coamings around the top decks, whenever the hatches are open, for any moisture."

There is always a rather sudden drop in temperature, coming out of the warm Gulf stream into the Labrador current, at a point quite near to Halifax, the second officer testified; and the ship's log establishes the fact that this expected change took place beginning February 1st from an air temperature of 63° at 4 A. M., through February 5th, at 8 A. M., in Halifax Harbor, 8°, with a rise to 32° at 4 P. M., on February 8th, on the way from Boston to New York. This temperature drop, with consequent inrush of cold air into the warmer holds, induces condensation, as is a well-known fact.

Counsel for libelant contend that there was defective ventilation, and improper stowage of the tea which, it is claimed, was made evident by dislodgment of some few chests into the hatchway square, and that they have established negligence on the part of the vessel, in these respects.

They rely strongly upon two cases, i. e., The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, and The Lake Fontanet, 5 Cir., 1923, 288 F. 544.

In the first-mentioned case, which involved a shipment of onions from Spain to New York, wherein great decay set in, the evidence was to the effect that both the hatches and the ventilators, during the 23-day voyage, were open but 170 hours, as against 482 hours that they were all closed; that the hatches and ventilators were both so closed, properly, 144 hours of the 482, and improperly 238 hours. The bill of lading exempted the carrier from liability for damage by decay and perils of the sea.

The Commissioner, to whom the matter had been referred, found as a fact that the decay resulted from improper ventilation of the cargo, and that the same was due, in part, to the enforced closing of both hatches and ventilators by reason of heavy weather, and, in part, to the negligence of the master and crew in failing to keep them open at night during fair weather. His report was to the effect that it was impossible to ascertain how much of the damage was due to lack of ventilation in fair weather and how much in bad. But, after comparing the periods of time during which the ventilators were negligently closed with those during which they were permitted to remain open or were properly closed because of the bad weather, the Commissioner concluded that it seemed "that the greater part of the damage must have been due to improper shutting of the hatches and ventilators," and that since the vessel had failed to show what part of the damage was due to the heavy weather, the libelant was entitled to recover the full amount of the damage claimed. The District Court found no basis for rejecting the Commissioner's report and rendered judgment in accordance therewith. 43 F.2d 247. On appeal, the Second Circuit Court of Appeals, 70 F.2d 261, reversed this judgment, holding that since damage by decay was covered by the bill of lading exception from liability, it was incumbent upon libelant to establish what part of the damage suffered was withdrawn from the scope of the exception, by reason of the carrier's negligence.

The Supreme Court, on certiorari, found want of diligence in providing proper ventilation, and lack of ventilation as the cause of the damage to the onion cargo, although it was not clear what part of the damage was due to lack of ventilation caused by the carrier's proved negligence, and what part was properly within the scope of the exception from liability as caused by lack of ventilation which was beyond the carrier's control. The Supreme Court held that, under such circumstances, the burden being upon the carrier, in the first instance, to relieve itself from liability either by pointing to its specific exemption from liability under bill of lading exceptions or by showing absence of negligence on its part, such carrier must be held liable for the whole amount, and not

only a part, of the decay damage resulting from the lack of ventilation.

The Lake Fontanet case involved a solid cargo of coffee from Brazilian ports to New Orleans, and the court [288 F. 545] held that if "stowing and dunnaging of the cargo had been done in a different and entirely practicable manner, the damage complained of would have been avoided." The description of the stowing and dunnaging found in the appellate court's decision clearly sets out, in detail, a case of negligent stowing and dunnaging, viz: "* * * The ship's holds were arranged for loading coffee in them by bolting on to its upright steel ribs, which were 24 inches apart, wooden battens, which are planks 6 inches wide and 2 inches thick, with spaces of 9 inches between them. As the sacks of coffee were loaded into the vessel, mats made of long dried reeds were laid between the wooden battens and the sacks, the ends of such mats overlapping as one was laid next above another against the battens. The pressure of the coffee sacks against the mats caused the mats, particularly their ends, to come in contact with the steel side of the ship, which was 8 inches from the inside surface of the battens, with the result that moisture was conveyed from the ship's steel skin or side to the coffee sacks next to the battens. Such mats were also used to cover the coffee stowed in the holds. That covering did not keep the moisture dripping from the steel beams above from reaching the top layer of coffee sacks. The coffee which was damaged was that which was in sacks next to the battens and that which was in the top layer of sacks."

In this present "tea case", out of the 541 chests involved in the shipment, but nine are alleged to have been damaged by shipsweat. Whether they were stowed on the top or on the sides, or whether they or any one or more of them were the chests dislodged from their original location and cast into the square of the hatch, or if they actually were so dislodged and cast, whether they were then and there subjected to dripping moisture from the hatch coaming, is not established; there is nothing in the record to even suggest that the chests' contact with shipsweat could not have resulted from the perils of the sea (also one of the exceptions from liability under the bill of lading terms), rather than from negligent stowage and dunnaging.

There is no evidence, here, of negligent stowage and dunnaging as was apparent in the Lake Fontanet case; here, we find no simple placing of mats, made of long dried reeds, between the battens and the cargo,—dried reeds coming into contact with the moisture-covered steel sides of the ship and serving as effective conduits of shipsweat to the cargo,—as was the case with respect to the coffee cargo.

There is no evidence, furthermore, that any one or more of the 541 tea chests were actually stowed immediately under the ceiling of the No. 1 'tween-decks hold and that, because of defective cargo matting used as a protection against possible dripping of moisture from such ceiling, or because of negligence in spreading the usual and appropriate cargo matting over the upper tier of the stow, nine of the 541 chests were damaged by shipsweat. The upper tier of coffee sacks, in the Lake Fontanet stowage, was covered by "mats made of long dried reeds * * * [which] did not keep the moisture dripping from the steel beams above from reaching the top layer of coffee sacks".

### Findings of Fact.

1. The Silverteak was an entirely seaworthy cargo vessel and, particularly, for the carriage of libelant's 541 chests of tea.

2. Nine of said chests were damaged by shipsweat.

3. Liability for cargo damage caused by perils of the sea and/or sweat was excepted under the terms of the bill of lading covering the shipment of said 541 chests of tea.

4. There is no proof that the contact of shipsweat with the nine damaged tea chests was proximately caused by the carrier's negligence in stowage or in ventilation, and that such contact could have been prevented by the exercise of proper care and skill.

### Conclusions of Law.

The respondent having successfully borne the legal burden of establishing the required seaworthiness of the Silverteak and that the damage complained of resulted from an excepted cause, and the libelant having thereupon failed to prove that such excepted cause did, itself, proximately result from negligence on the part of the vessel, judgment must be rendered in favor of respondent, and against libelant, dismissing the suit, with costs.

A decree may, therefore, be entered in favor of the respondent and against the libelant, so dismissing said suit, with costs.