STANDARD BRANDS, Inc. v. THOS. & JNO. BROCKLEBANK, Limited.

THE MARKHOR.

No. 124–46.

United States District Court
S. D. New York.

July 27, 1948.

Harry D. Thirkield, of New York City, for libellant.

Lord, Day & Lord, Franklin B. Lord, Jr., and Edmund P. Rogers, all of New York City, for respondents.

BONDY, District Judge.

This suit was brought to recover for loss resulting from ship sweat to a cargo of tea which was received in cases in apparent good order and condition November, 1939 at Calcutta aboard the respondent's steamship Markhor. It was transported by way of the Cape of Good Hope and discharged at Boston in a seriously damaged condition in the early part of January, 1940 after a voyage of about fifty-seven days.

The tea was stowed in tiers in the forward part of No. 2 'tween-deck together with jute and gunnies. The No. 2 hold had four cowl ventilators, rising from twelve to fifteen feet above the deck, two forward and two aft, which led through the weather deck into the 'tween-deck and down to the lower hold, and were from two and one-half to three feet in diameter where they led through the weather deck. It was conceded that throughout the voyage all four ventilators were trimmed with their backs to the wind and the evidence discloses that whenever the weather permitted the hatch covers were raised. For purposes of ventilation, trunkways, openings in the cargo, from eighteen inches to two feet square, led vertically from the corners of the hatches on the weather deck through the 'tween-deck to the lower hold.

During the fifty-seven days of the voyage the ship experienced the usual North Atlantic winter weather. The seaworthiness of the ship and the construction and sufficiency of her ventilators were not questioned.

The libellant contends that the respondent was negligent in stowing the tea with jute and in trimming the ventilators leading through the No. 2 'tween-deck away from the wind from the beginning to the end of the voyage. The respondent urges that keeping the ventilators trimmed back to the wind was proper, that from the start of the voyage and until the vessel left the Gulf Stream the temperatures of the atmosphere

and in No. 2 'tween-deck were substantially the same, that after the vessel left the Gulf Stream it became necessary, on account of heavy seas and spray, to keep the hatches battened down and that, notwithstanding all that could done, most of the heavy sweat was caused by a drop in temperature of twenty to thirty degrees upon emerging from the Gulf Stream forty-eight hours or more before arriving at Boston.

The record presents only questions of fact, the law applicable thereto being well settled. Although the bills of lading provided that the shipowner shall not be responsible for damage arising from sweat, such limitation is subject to the provisions of Section 3(8) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(8). By Section 4(2) of that Act, 46 U.S.C.A. § 1304(2), it is provided that "neither the carrier nor the ship shall be responsible for loss or damage arising or resulting" from "perils, dangers, and accidents of the sea" or from "any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." It has been held that sweat is a peril of the sea only when the carrier has not been guilty of negligence in handling the cargo, and the carrier has the burden of proof. Wessels v. The Asturias, 2 Cir., 126 F.2d 999, 1000, affirming The S. S. Asturias, D.C., 40 F.Supp. 168; Eppens, Smith Co. v. Silver Line, 5 Cir., 128 F.2d 882. In Wessels v. The Asturias, supra, Judge Frank stated the rule as follows: "In our view, the carrier remains liable if it fails to provide, without excuse, sufficient ventilation, or if its improper stowage contributes to the sweat, or if it is otherwise negligent in handling the cargo. Sweat, then, can be regarded as a peril of the sea only when all available and reasonable precautions are taken to avoid it."

In the "Report on Homeward Cargo" made by the chief officer of the Markhor on February 17, 1940, it is stated: "Wide range of temperatures experienced–20°–30° within 48 hours of arriving at Boston. During this period the hatches were unable to be opened owing to weather condition and was probably the cause of hatches sweating. No unusual heavy gales experienced during the passage."

Witnesses for the libellant, experienced in transporting tea from India, testified that the excessive sweat in No. 2 'tween-deck was caused by lack of ventilation from the beginning of the voyage since such heavy sweat could not be produced in a few days, that they would have trimmed two ventilators into the wind and two away from the wind, that as a rule jute and tea are stowed apart, that jute holds heat in stow and that the air in the tropics is not always moist but its moisture content must be ascertained at the time the vessel is in the tropics. Witnesses for respondent admitted that at Boston the tea in No. 2 'tween-deck was found to be so excessively damaged by sweat that the men discharging it received extra pay for working under distressing conditions. They testified that the only other damage observed at that time was slight damage to cotton in the No. 2 hold, to scrim in No. 1 hold and to tea in No. 5 hold, that until two or three days before arrival at Boston the temperatures of the air ranged from about thirty to sixty degrees, that the temperature inside the cargo compartments from India until leaving the Gulf Stream "should" have been substantially the same as the outside temperature, that all ventilators are always kept back to the wind even in good weather for jute cargo, for which a gradual change in temperature is desirable, that it is customary to stow jute and tea in the same hold, that what is proper ventilation depends on the type of cargo, that jute should be ventilated differently from tea, that jute is hygroscopic, that the effect of turning ventilators into the wind before entering the Gulf Stream would be the forcing of more moist air into an already moist compartment, that with all ventilators away from the wind there is a slow circulation of air, that for the two or three days of the voyage after leaving the Gulf Stream the heavy seas and spray prevented turning ventilators into the wind, that the damage to the tea was increased because all was not discharg-

ed in one day, that the undischarged tea sustained sweat damage during the night, that the sweat damage probably occurred when the vessel struck cold weather upon leaving the Gulf Stream, that the cause of such excessive sweat was a mystery and it must have been there five or six days or more to cause such damage. One such witness stated that he disagreed with the statement at page 267 in "Modern Ship Stowage", a 1942 United States Department of Commerce publication that "usually jute contains a considerable amount of moisture" and that it "should not be stowed in the same compartment with goods that are liable to heat or with goods that are liable to be damaged by moisture." At page 398 it is also stated that tea "is one of the most delicate cargoes carried from the Far East and must be stowed well apart from all odorous and moist goods."

Witnesses for both parties testified that in their opinion such excessive sweat could not have been produced in only a few days. The drop in temperature experienced after the vessel left the Gulf Stream therefore cannot be considered the sole cause of the unusual sweat. Though respondent contends that greater moisture would have been introduced into the 'tween-deck by any increased ventilation before entering the Gulf Stream, there is not any evidence as to the humidity of the atmosphere or in the hold at any time. It is possible that the heat and humidity in the atmosphere during the voyage was less than that in the hold and that ventilation by turning two ventilators into the wind would have reduced the humidity and heat in the hold.

Eppens, Smith Co. v. Silver Line, D.C., 37 F.Supp. 684, affirmed 5 Cir., 128 F.2d 882, was a case dealing with a shipment of tea brought from Batavia, Java and delivered in New York on February 9, 1939. The tea was stowed in a 'tween-deck into which led four ventilators, of which the lee ventilators were always trimmed to the wind and the weather ventilators always back to the wind. The district court quoted Captain R. E. Thomas' work on "Stowage" wherein this practice was approved. The court also referred to the testimony that it is preferable to stow tea alone in a compartment.

In The Norte, D.C., 69 F.Supp. 881, which involved a shipment of tartaric acid powder transported from Barcelona to Philadelphia, the court referred to Ford, "Handling and Stowage of Cargo" (2d Ed. 1944) 218 for the proposition that "generally, the lee ventilators should be trimmed into the wind and the weather ventilators against the wind, since the natural flow of warm air in an enclosed compartment is opposite to the direction of the wind."

Respondent refers to The Magdapur, D.C., 46 F.Supp. 517 and George F. Pettinos, Inc. v. American Export Lines, D.C., 68 F.Supp. 759, affirmed 3 Cir., 159 F.2d 247, to establish that good ventilation is produced by turning all ventilators back to the wind, but in these cases the courts stated that there was no evidence that more ventilation was required.

The testimony of the witnesses is so confused and conflicting that the court cannot find on the evidence that the respondent has borne the burden of proving that the actual fault of its agents did not contribute to the damage. It does not satisfactorily appear that it was proper to stow tea which is a dry and delicate cargo and easily susceptible to damage by moisture in the same compartment with a large quantity of jute and jute products which are hygroscopic and readily produce moisture, or that the hold was properly ventilated by trimming the ventilators back to the wind during the entire voyage.

The decree accordingly should be in favor of libellant.