**WESSELS et al. v. THE ASTURIAS et al.**

**No. 182.**

Circuit Court of Appeals, Second Circuit.

March 14, 1942.

Haight, Griffin, Deming & Gardner, of New York City (Herbert M. Statt and David L. Corbin, both of New York City, of counsel), for claimant-appellant.

Bigham, Englar, Jones & Houston, of New York City (Ezra G. Benedict Fox, of New York City, of counsel), for libellants-appellees.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This is an appeal from a decree in favor of libellants for damage to 1,171 bags of cocoa beans shipped on board the Nor-

wegian steamship Asturias from Ilheos and Bahia, Brazil, to New York. These bags were part of a shipment of 18,000 bags consigned to libellants, which, in turn, constituted about half of the vessel's total cargo of 36,500 bags. The bags were admittedly received by the ship in apparent good order, and as a result of the damage, which is not disputed here, 1,171 stained bags had to be reconditioned and 7,912 pounds of skimmings had to be destroyed.

The trial court found that the damage was caused by sweat. The bills of lading stipulated that the carrier should not be liable for sweat damage, but by 3(8) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(8),[1] to which this shipment was subject, any such limitation of liability must be authorized by the provisions of the Act. The carrier urges that sweat is a peril of the sea for which it is not responsible, 46 U.S.C.A. § 1304(2).[2] The leading American case is Clark v. Barnwell & Ravenel, 12 How. 272, 13 L.Ed. 985, which holds that sweat is a peril of the sea. It has often been followed and applied. See Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 79 L.Ed. 373, and cases cited in 4 Rose's Notes on United States Reports (rev. ed., 1917) 427, and cf. Carver's Carriage by Sea (8th ed.) 138n.

 Without meaning to set up a hierarchy of presumptions or of rules relating to burden of proof, we think that the taint of sweat damage is sufficiently answered if the carrier shows that the cargo has an unavoidable tendency to cause sweat, or that the weather conditions made it impossible to ventilate the cargo properly. In our view, the carrier remains liable if it fails to provide, without excuse, sufficient ventilation, or if its improper stowage contributes to the sweat, or if it is otherwise negligent in handling the cargo. Sweat, then, can be regarded as a peril of the sea only when all available and reasonable precautions are taken to avoid it. This is, of course, not new doctrine: "* * * although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time, the carrier is liable." Clark v. Barnwell & Ravenel, supra, 12 How. at page 280, 13 L.Ed. 985.

 There is no dispute that cocoa beans, during the winter months, are quite likely to sweat. The bean is soft and moist, the bags are loaded in a hot and humid climate, and the ship must pass from the Gulf Stream into cold coastal waters in the course of the voyage. The consequent drop in temperature causes condensation in the holds, which often results in damage to the cargo. In the case at bar the loading took place in temperatures above 80 degrees F., and the voyage was made in temperatures that gradually dropped to 41 degrees F. Because of heavy seas the hatches had to remain battened down during much of the voyage. Under these conditions some sweat was probably unavoidable, and could have been excused as a peril of the sea.

But the shipper here did not rest its case merely on a showing of damage by sweat. Elliott, its surveyor, testified that he examined 14 samples, selected at random, from among the 467 damaged bags so far discharged. By the conventional silver nitrate test, he concluded that salt water had contributed to the damage. Broken down, the reactions to his tests were: "1 heavy salt, 4 salt, 5 light salt, 2 trace and 2 nil." Exception was taken by Lynner, the ship's surveyor, to these tests, because tap rather than distilled water was used. Without meaning to approve the use of tap water, we think the fact that various reactions were obtained indicates that the water used for testing could not materially have affected the results. Furthermore, Elliott's findings were to some extent corroborated by the results of Lynner's tests, since out of 24 samples tested by him, half showed a "slight chloride reaction." We

---

[1] "Limitation of liability for negligence. Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in this section, or lessening such liability otherwise than as provided in this chapter or section 25 of Title 49, shall be null and void and of no effect. * * * "

[2] "Uncontrollable causes of loss. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—* * * (c) Perils, dangers, and accidents of the sea or other navigable waters; * * *."
This exemption of the Carriage of Goods by Sea Act does not alter the exemption created by the 1893 Harter Act, 46 U.S.C.A. § 192, which it has in part supplanted. Cf. Robinson on Admiralty (1939) 503–505, 524.

think that there was sufficient evidence to permit the district court to find that the presence of sea water, by increasing the amount of moisture which condensed in the holds, contributed to the damage. Proof of the presence of sea water, it cannot be disputed, raises a presumption of unseaworthiness which the carrier must rebut. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546, 15 Ann.Cas. 748.

 The rebuttal was weak, and was not accepted by the district court. Lynner testified that any leakages in the ship's skin would have caused corrosion, indicated by reddish streaks, and that his examination revealed no such evidence of the penetration of salt water through the skin of the ship. His explanation of the presence of sea water was that salt from spray might have encrusted the inside of the ventilator, and then been washed down in the sweat which condensed there. But the Asturias had 30-foot kingpost ventilators, with caps over the tops. While Lynner testified that sufficient spray could get into even such ventilators, his testimony was, to say the least, not controlling. The district court characterized his explanation as "not plausible" and as "mere theory," and said that Lynner evinced a disposition "to stick to the ship." There was no evidence, furthermore, that the salt-stained bags, or indeed any of the damaged bags, came from beneath the ventilators. In the circumstances, we cannot say that the trial court's findings were clearly erroneous, for it is not our function to pass anew on the weight of conflicting testimony or to make an independent judgment as to the credibility of a witness. Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., March 2, 1942, 126 F.2d 978; Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., March 10, 1942, 126 F.2d 992. As the trial court found that the ship failed to rebut the presumption of negligence created by the presence of sea water, and as sea water contributed to the damage in some unknown degree, the ship is liable for the whole damage. Schnell v. The Vallescura, 293 U.S. 296, 306, 307, 55 S.Ct. 194, 197, 79 L.Ed. 373.[3]

Since this ground is a sufficient basis for the ship's liability, we need not pass on the second ground advanced by the libellant, i.e., that insufficient ventilation also contributed to the damages. There was conflicting evidence as to the adequacy, for a cargo of cocoa beans, of the ship's ventilating system, and as to the desirability of using rice ventilators with such a heating cargo. Whatever the truth of these matters, there was enough evidence to sustain the trial court's apparent conclusion that the use of matting on top of the cargo was improper because, as Lynner himself had written some years before, "where sweat may gather * * * it [matting] is more likely to cause damage than to have any beneficial effect. It will both prevent the circulation of air and also transmit moisture." We might also be disposed, if it were necessarily presented, to uphold the trial court's conclusion that improper attendance to the hatches might have permitted the entrance of sea water or rain. Because we affirm on the first ground, however, we need not directly pass on this second ground.

The decree is affirmed.

[3] "Similarly, the carrier must bear the entire loss where it appears that the injury to cargo is due either to sea peril or negligent stowage, or both, and he fails to show what damage is attributable to sea peril. * * * In each of these cases the carrier is charged with the responsibility for a loss which, in fact, may not be due to his fault, merely because the law, in pursuance of a wise policy, casts on him the burden of showing facts relieving him from liability.

"The vessel in the present case is in no better position because, upon the evidence, it appears that some of the damage, in an amount not ascertainable, is due to sea peril. That does not remove the burden of showing facts relieving it from liability. If it remains liable for the whole amount of the damage because it is unable to show that sea peril was a cause of the loss, it must equally remain so if it cannot show what part of the loss is due to that cause. * * * Since the respondent has failed throughout to sustain the burden, which rested upon it at the outset, of showing to what extent sea peril was the effective cause of the damage, and as the petitioners are without fault, no question of apportionment or division of the damage arises."