## THE VERMONT.

### GLIDDEN CO. v. THE VERMONT et al.
No. 16054.

District Court, E. D. New York.

Oct. 8, 1942.

As Corrected Oct. 13, 1942.

Otto & Easterday, of New York City (Henry E. Otto, of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Burton H. White, of New York City, of counsel), for claimant-respondent.

CAMPBELL, District Judge.

This suit was brought by the libellant, the owner of a cargo of cocoanut oil, which was, at the port of Portland Oregon, loaded on board the Steamship "Vermont", owned by the claimant-respondent, California Eastern Line, Inc., to recover damages alleged to have been caused to said cargo by the contamination by mineral oil while in the port and starboard deep tanks in hold No. 3 of the said S.S. "Vermont".

Claimant-respondent denies the damages claimed, and alleges in the alternative that if there was any damage neither it nor the S.S. "Vermont" is responsible under the provisions of the contract of carriage, and of the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. § 1300 et seq.

The S.S. "Vermont" was a common carrier, being a general ship engaged in the common carriage of libellant's shipment of oil. The Point Brava, D.C., 1 F.Supp. 366. She was sailing on a line engaged in the intercoastal trade, and the voyage in question, described as No. 9, was an intercoastal voyage between the Port of Portland, State of Oregon, and the Port of New York.

The oil was booked pursuant to a letter of March 13th, 1940, which was prepared and sent by claimant-respondents' San Francisco agents to the libellant, at its Food Division, which is carried on under the trade name of Durkee Famous Foods. Called by whatever name it may be, it states the terms under which space was reserved on the "Vermont", on the voyage in question, for a minimum quantity of 700 short tons of cocoanut oil in bulk.

The conditions of transportation as set forth in that letter, are as follows: "Rate of freight and terms as specified in United States Intercoastal Eastbound Freight Tariff No. 2-C, S.B.-I No. 7, Section 5, supplements thereto and reissues thereof, and subject to all terms and conditions of Carrier's Bill of Lading."

The terms of these rules, which have been certified by the Interstate Commerce Commission under the Transportation Act 1940, Title 49, Sections 901–923, U.S.C.A. contain the following provisions:

Rule O-3. Liability. Carriage of oil in bulk is at the owner's risk of loss, contamin-

ation, discoloration, leakage, seepage, or any damage the oil may suffer through being carried in bulk or any damage from steam coils and/or their connections.

Rule O-4. Tanks, Cleaning and Inspection. The carrier is to clean and prepare tanks prior to vessel's loading and to install heating coils when necessary. If the shipper's surveyor rejects tanks as not fit for the carriage of oil to be carried, carrier shall have the option of doing whatever further cleaning and preparing is called for by shipper's surveyor or cancelling the booking and sailing the ship without liability or penalty. Acceptance of tanks by shipper's surveyor shall be deemed prima facie evidence of their fitness for the carriage of the oil. The expense for cleaning the ship's tanks is to be borne by the carrier and inspection thereof is for the account of and at the expense of the shipper.

Rule O-5. Loading and Discharging. Carrier will not make more than one shift to safe berth at loading port and not more than one shift to safe berth at discharging port, and if consignee fails to have facilities available when vessel is ready to discharge, carrier may employ barges, lighters or other equipment and proceed with the discharge of the oil thereto, all expense for such equipment as well as for the discharge of the oil being for the account of the cargo owner, or consignee thereof. (See Exceptions 1 and 2.)

Rule O-6. Pumping Oil. All appliances and labor necessary for pumping the oil in and out of vessel to be provided by owners and/or consignees of the oil at their expense; carrier to furnish steam for heating as well as power for pumps to enable adequate discharge of the oil.

Said shipment of bulk cocoanut oil was transported subject to the terms of a bill of lading, in which was incorporated the provisions of the Carriage of Goods by Sea Act approved April 16, 1936, Title 46, U.S. C.A., Sections 1301-1315.

By Title 46, U.S.C.A., Section 1300, the Carriage of Goods by Sea Act is made applicable to every bill of lading or contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, not in intercoastal trade, but the parties had the right to incorporate the provisions of the Carriage of Goods by Sea Act in the bill of lading, Section 1312 of that Act.

By Section 1303 of that Act subdivision 1, the carrier is bound, before and at the beginning of the voyage to exercise due diligence to—make the ship seaworthy, to properly man, equip and supply the ship, and to make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

By Section 1305 of that Act it was provided that a carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under the Act.

■ That Act, however, does not give the carrier the right to relieve itself from any of its responsibilities and liabilities. The Steel Inventor, D.C., 35 F.Supp. 986.

Libellant contends that the rules, supra, are without effect here, as they release the carrier of some of its responsibilities under the Carriage of Goods by Sea Act contrary to the terms of that Act, but that contention is not generally sustained.

■■ The obligation of the carrier under Section 1304 of that Act is to use due diligence, and the burden rests upon the carrier to show the exercise of due diligence, and so far as Rule O-3 is concerned, it does not relieve the carrier from using due diligence to make the vessel seaworthy, with clean tanks for the cargo, nor is intended so to do as by Rule O-4 the cleaning of the tanks is specifically provided for, and furthermore, if construed so to relieve, it would be void under the Carriage of Goods by Sea Act, supra.

■ The provisions of Rule O-4 making the cleaning of the tanks as called for by the surveyors for the shipper and their acceptance prima facie evidence of their cleanness, did not relieve the carrier from any obligation, but simply created a rule of evidence, and in no way conflicted with the Carriage of Goods by Sea Act, supra, and are binding in the instant suit.

■ The provisions of Rules O-5 and O-6 supra, requiring the shipper or consignee to load and to discharge the bulk oil cargo, and be responsible for it, and for the equipment furnished by it, and its cleanness, and availability for the purpose, did not relieve the carrier from any obligation imposed on it by the Carriage of Goods by Sea Act, and said rules are binding.

On behalf of the libellant, it is contended that not only must the carrier, in order to be relieved, show due diligence to make the vessel seaworthy and the deep tanks clean, but, must also show the cause of the damage, and cites the following cases as authority for its contention. The Arakan, D.C., 11 F.2d 791, 793; Newhall et al. v. United States et al., D.C., 8 F.2d 422, 423; The Rosalia, 2 Cir., 264 F. 285, 288; The S.S. Asturias, D.C., 40 F.Supp. 168, 173, affirmed Wessels v. The Asturias, 2 Cir., 126 F.2d 999, 1942 A.M.C. 360.

All of these cases, with the exception of The S.S. Asturias, were decided before the Carriage of Goods by Sea Act became effective, and required the loss to be brought within certain specific exceptions.

■ That has been changed by the Carriage of Goods by Sea Act supra, § 4(2) (q) pleaded in claimant-respondent's answer, as under that Act the carrier does not have to show the cause of the damage, but has the alternative burden of showing freedom from negligence. Owners of Cargo of The City of Baroda v. Hall Line Ltd., 42 Times Law Reports 717, 719.

Such proof was not found in The S.S. Asturias, supra, but, it is found in the instant suit.

■ The libellant has advanced by direct charge, or by way of suggestions, a number of contentions, as to claimant-respondent's liability, but it seems to me that the principal one it now asserts, is, its claim of having made out a prima facie case by showing delivery to the vessel of the cargo in good order and condition, and the delivery thereof to the consignee in a contaminated condition, but that of course, does not overcome proof of due diligence to make the vessel seaworthy, and the tanks clean at the time of the loading of the cargo.

On April 24th, 1940 there was laden into the port and starboard deep tanks of the S.S. "Vermont", at Portland Oregon, the libellant using its own equipment, a quantity of cocoanut oil after the said deep tanks had been inspected and examined by the surveyors, representing the libellant, and certain of the ship officers, and after the further cleaning, by the shore crew of cleaners, called for by the said surveyors representing the libellant the said deep tanks were found by them to be fit, and accepted by them for the carriage of the oil.

The S.S. "Vermont" on the westbound voyage, No. 8 immediately preceding the voyage in question, and on some prior voyages had carried a cargo of light mineral oil (petroleum) in both of said deep tanks, and on said voyage No. 8 had discharged said mineral oil cargo from the deep tanks at Oakland, California.

After discharging such cargo of oil, and while the vessel was en route to Seattle, each deep tank was filled up with salt water to about twelve inches from the top of the tanks.

On the arrival of the "Vermont" at Seattle, on April 18th, 1940, there was pumped into said deep tanks, a head of water with pressure enough to send the water up in the sounding pipe, seven or eight feet, that is, above the top of the tanks.

Mr. Saulsbury, an outside surveyor from Lauck's Laboratory, was present, and he, with the Chief Officer and Chief Engineer, examined the tanks and the fore and aft bulkheads, over the deckhead, and in No. 3, and also looked on the outside, to find if there were any rivets showing water leakage, and found them all tight, no water leakage anywhere.

This, obviously did not include an inspection of the top of the double bottom tank, which was the bottom of the deep tank, and which was covered with water.

After this inspection, and examination was concluded, the water in the deep tanks was pumped out at 8 o'clock A.M., on April 19th, and the ship's crew began washing down the tanks with hot water, under a pressure of 70 pounds, finishing at 12 o'clock noon of that day. The deep tanks were then steamed for a period of from 16 to 20 hours, and the condensation pumped over the side.

The "Vermont" arrived at Portland on the 20th day of April, 1940, and on the 22nd a shore crew of experienced men, working on a patent staging, carefully scaled, and completely washed, the deep tanks, with a hot solution of Turco No. 7 (a mixture commonly used in the cleaning of tanks), and caustic mixed with water, and applied with a special pressure device at a pressure of 300 to 400 pounds, which should get in all of the cracks and crevices throughout the tanks, the effectiveness of the device being described by the engineer who designed it. All the corners, cracks, and irregular surfaces were cleaned, in the usual manner, with scrapers and rags soaked in

mineral spirits. The residue was cleaned up and pumped out. This work was carried on continuously from 8 o'clock A.M. on April 22nd, to 5 o'clock A.M. on April 24th, 1940; 350 man hours being consumed.

It seems quite clear to me that with the steaming, washing and scraping of the tanks, which took place before the loading, any trace of mineral oil would have been brought out, and when the cleaning of the tanks was finished, there was not a trace of filth or mineral oil, or other source of contamination.

The libellant contends to the contrary, but I am convinced that before loading the oil cargo, the double bottom tanks were tested with oil, under a 14 feet head pressure during inspection, and 4 feet for twelve hours, and found to be tight, and that 14 feet head pressure was sufficient for the test. The newly installed heating coils were tested under 125 pounds steam pressure, and found to be tight, and all smothering lines and suction lines were securely blocked off.

The deep tanks and the tops of the double bottom tanks, which were the bottoms of the deep tanks, were inspected by R. H. Rawson and C. O. Wilson, surveyors, employed on behalf of the libellant, through Curtis & Tompkins. These two surveyors employed on behalf of the libellant, went over the tanks, after the cleaning had virtually been completed, with a spot-light, and a scraper, which they used on the iron, and inserted in the cracks and found certain places, which they asked to have further cleaned, particularly in the corners, and other places where they found small spots of fish oil, and bitumastic paint. All of the requests of the said surveyors for further cleaning were complied with, and, when this was done, the surveyors again thoroughly examined all parts of the tanks, and found them to be clean, and without any traces of mineral oil, and found them fit and accepted them for the transportation of the cocoanut oil. The tanks were also inspected by the Chief Mate and the Chief Engineer of the "Vermont", who also found them to be clean and fit for transportation of the oil.

The method of cleaning the tanks accorded with good and usual practice, and the examination was considered a thorough one.

On April 24th, 1940, the oil was loaded on board the "Vermont" by the libellant, using its own equipment.

Samples of the oil, when loaded, were taken by representatives of the libellant, and the claimant-respondent.

The "Vermont" was seaworthy, properly manned, supplied and equipped at and before the beginning of the voyage. Between Marshfield Oregon, and San Francisco, the "Vermont" had a little bad weather. On May 2nd the "Vermont" had southeasterly wind force 5 to 6 on the Beaumont scale, and on May 3rd she had quite rough weather up to force 7 on said Beaumont scale, quite a rough sea and swell. It was a head wind, and the ship was rolling, but not heavily, but she was pitching in a head sea.

On May 9th the wind went up from force 2 to force 6, the ship was rolling slightly, but not pitching much.

On May 26th at Marshfield the "Vermont" took on some lumber in No. 2 lower hold.

The "Vermont" on April 25th, after leaving Portland, had 3,839 barrels of fuel oil on board, for the use of the ship, and at Los Angeles she took on 1,201 barrels of fuel oil. On June 4th, the day of her arrival at Baltimore, the "Vermont" had 1,555 barrels of fuel oil aboard, and did not take on any fuel oil, but did take on fresh water. The lumber cargo was discharged, some at Baltimore, some at New York, and some at Albany.

The "Vermont" arrived at New York on June 8th, 1940, and the discharging of the oil cargo commenced at 12 o'clock noon on that day, and was completed at 11:20 o'clock A. M. on June 9th, 1940. Samples of the oil were taken before discharging of the oil commenced, representatives of the consignee, the libellant, and of the claimant-respondent, came aboard, and took a sample, and samples from about each foot in depth of the tanks, which samples were divided, part going to the ship's representatives, and part to the consignees, the libellant.

The oil was thereupon discharged by the agents of the libellant, using their own equipment.

When the bulk of the cargo of oil had been discharged, the witness Bernhammer, who was then in the employ of the New York Tank Barge Company, who took care of the pumping of ships and cleaning of tanks, while engaged in the pumping of the oil cargo from the "Vermont", says he went down to clean out the tank of the residue

generally found in tanks, and noticed mineral oil running around the stanchion in the vicinity of the base plate, and it was also flowing from quite a few rivets around the whole stanchion, and other places around, which he pointed out to Mr. Joyce, a surveyor for the libellant, and the Chief Officer of the ship, which smelled like fuel oil to him, and that Mr. Joyce took a sample, and the Chief Officer or Chief Engineer of the vessel, took a sample, and the Chief Officer or Chief Engineer said there wasn't anything wrong with the oil; that there was copra meal or dirt mixed in it. I believe that the witness Bernhammer is in error, as to the oil coming from the stanchion or flooring, as the only place on the ship from which fuel oil could come, would be the double bottom tanks, and there was too little oil in them, to cause any oil to flow from them while the vessel was at a dock in the harbor.

Although questions were asked on behalf of the libellant, as to oil carried in the deep tanks of the "Vermont" on previous voyages, no evidence has been offered to show any contamination on previous voyages, although the oil had been handled in the same way.

The samples, which were given to the claimant-respondent from the composite sample of the contents of the bulk of each tank of the "Vermont", taken at the time of discharge, were, on behalf of the claimant-respondent, analysed by an analytical chemist of experience and good standing in his profession, who made an examination for mineral oil contamination. He separated the unsaponifiable matter, and dissolved that in ether, and made a test and examination for fluorescence, which would indicate the presence of mineral oil in that concentrated portion, and did not find any mineral oil present, or that there was any fluorescence indicating that there was mineral oil present.

On behalf of the libellant there were delivered to an analytical chemist of experience and good standing in his profession, on June 10th, 1940, for analysis, two samples of cocoanut oil, one of each tank of the "Vermont", marked as taken at the time of the discharge, June 9th, 1940, for analysis, the reports thereon bearing Nos. 68,953 and 68,954, and on June 12th, 1940, for analysis two samples one from each tank of the "Vermont" marked as taken April 24th, 1940, on loading, the reports thereon bearing Nos. 68,979 and 68,980.

On July 31st, 1941, there was delivered to him for analysis, two samples marked as having been taken June 9th, 1940, one from the bottom of each tank of the "Vermont" on discharging, the reports thereon bearing the Nos. 71662 and 71663.

An analysis of each of these samples was made, part of the work being done by the chemist himself, but most of it by an assistant, under his supervision.

As I understand the testimony of the chemist, he did not notice anything unusual about unsaponifiability of the loading and discharging samples of the bulk of the cargo received on June 10th, and June 12th, 1940, respectively, and that his determination was based largely, if not entirely, on the test of color. Without questioning in any way his findings, as to the difference in color between the loading and discharging sample of oil, or the color of the said discharging sample as found by him, it seems to me that there are so many things, other than contamination, with fuel oil, that might account for the change in color, that such color is not a convincing test, in view of the fact that no contamination was found by him on the saponification test.

The testimony shows that the oil in question, on loading, was of a darker color than usual with that character of cocoanut oil, due to the condition of the copra, the age of the oil, or other causes; that the color of cocoanut oil will darken by standing in the tanks during transportation, and that the change in color of the cocoanut oil in question was within the limits of the change in color of such oil when there is no contamination.

The libellant also offered evidence of an analysis, made on August 13th, 1940, for color of samples marked taken from the deep tanks of the "Vermont" on June 8th, 1940, by an associate of claimant-respondent's chemist acting independently who found that the color of the oil was very dark, much greater than is normally found in good quality oils, and such as to indicate contamination. He did not say that such contamination was by fuel oil.

To me, the analysis of claimant-respondent's chemist, of the bulk of the oil which was in no sense based on color, is more convincing, and I find that the bulk of the cargo was not contaminated by mineral oil.

As to the samples, taken from the bottom of the tanks, no analysis was offered on behalf of the claimant-respondent, and while I do not question the analysis of libellant's chemist, which was made more than one year after the discharge, it is hard to understand how that contamination could have occurred in the deep tanks, in the face of the testimony of the Chief Engineer of the "Vermont", no longer employed by the claimant-respondent, that a thorough examination of the tanks after discharge of the cargo, revealed no source of possible contamination. Further, if such contamination of the oil in the bottom of the tanks, as shown by such analysis, had existed for any length of time before the discharge, it is difficult to understand why it would not have so contaminated the bulk of the oil in the tanks, as to have it unmistakably appear on an analysis.

This brings us to a consideration of the question of, whether there was any negligence on the part of the ship and claimant-respondent.

The libellant first contended that the damage was occasioned by the "Vermont" and the claimant-respondent causing, allowing and permitting the cargo to become damaged and contaminated by coming into contact with mineral oil, and by the failure of the respondent to properly, and thoroughly, clean the tanks of the S.S. "Vermont", before loading the tanks in question, in which there had been carried mineral oil (petroleum) on the preceding voyage. This, as I have pointed out, is not the fact, as claimant-respondent has affirmatively established, not only a thorough and proper cleaning of such tanks before the loading of the oil cargo, but also that the said tanks after being substantially cleaned, were examined by the surveyors representing the libellant, who called for further cleaning in designated places, which was done, and the tanks found clean and fit by such surveyors and accepted by them for the loading of libellant's oil cargo, and that was prima facie evidence of those facts.

Another contention of the libellant was that the alleged contamination of the cargo was due to the use of hollow column supports or stanchions in the deep tanks, in which lubricating oil from previous voyages accumulated, and during the voyage in question, or the heating of the tanks preparatory to discharge of the cargo, ran out during the discharge. This contention was entirely disproved, as the claimant-respondent affirmatively established by the testimony, not only of the "Vermont's" officers and other witnesses, but, also by that of the engineer, who supervised the construction work in the tanks, that the stanchions were not hollow columns, but H shapped beams. In addition to all of which the claimant-respondent showed that the libellant's surveyors before loading, after examination with a spot-light and scraper, found the tanks clean around the base of the stanchion and in fit condition to receive, and accepted them for the loading of, the cocoanut oil.

Another contention of libellant was that the oil was overheated during the voyage. This was not supported by any evidence, as the evidence clearly shows that the tanks were heated in the usual manner, by the gradual application of heat with the temperatures in general running between 90 degrees and 100 degrees Fahrenheit. There were no high temperatures, as the steam was turned off by the Chief Engineer himself, whenever the temperature would rise. The temperatures were never higher than 116 degrees, and that was noted at the time of the discharge of the cargo, when the temperature would naturally be highest.

The highest temperature was found only at the top of the starboard tank, in which the discharge temperatures were top 116 degrees, middle 109 degrees, bottom 100 degrees average 108.3 degrees. The temperatures in the port tank taken at the same time; top 114 degrees, middle 111 degrees, bottom 106 degrees, average 110.3 degrees.

It, therefore, appears that the tanks were not overheated, inasmuch as the instructions for the heating of the oil in question, given by Curtis & Tompkins, libellant's loading surveyors, to the vessel's agents, indicates that it was proper to heat the oil up to 115 degrees, and Mr. Linnett, the libellant's own expert, testified that it would be proper to heat the oil to an average temperature of 110 degrees.

No damage or discoloration was caused by overheating.

Libellant refers to damage to cargo in hold No. 4 and to the finding of oil-stained lumber in hold No. 2, which it contends was caused by a broken vent pipe in No. 2 hold.

The damage to cargo in No. 4 hold was not caused by oil or oil-stains, but resulted from an entirely different cause. How the oil which stained the lumber in No. 2 hold

could have been in any way responsible for damage to the cocoanut oil in the deep tanks in No. 3 hold, has not been pointed out, and I cannot understand how it could. The vent pipe was in No. 2 hold, and with the smothering lines and suction lines securely blocked off, as was testified to, oil from No. 2 hold, or the vent pipe, could not gain access to the deep tanks. I find that the broken vent pipe and oil in No. 2 hold did not cause any damage or discoloration to the oil in the deep tanks.

If libellant's contention is, that the break in the vent pipe through hold No. 2, in any way reduced the effect of the pressure of 14 feet in the test of the top of the double bottom tank No. 3, which was the bottom of the deep tanks, that contention is not sustained, because, the break in the vent pipe of the tank, under hold No. 2 occurred when the "Vermont" was loading lumber in No. 2 hold at Marshfield on the 26th day of April, 1940, two days after the completion of the loading of the libellant's cargo of cocoanut oil in the deep tanks of the "Vermont".

The suggestion was made on behalf of the libellant, that the damage might have been caused by oil from the deck, when the "Vermont" took on fuel oil for the use of the ship. The only place the "Vermont" took on board fuel oil for the use of the ship, was at Los Angeles, but at that time the tanks were covered, and no oil could have found its way into the deep tanks, and, if it had, it would have clearly shown contamination in the bulk of the cargo, as it would have passed through it. No evidence whatever sustains libellant's suggestion, and I find that suggestion was not sustained. If libellant believes, that any fuel oil was taken on at New York, before discharging the libellant's oil cargo, that belief is erroneous as the "Vermont" did not take on any fuel oil for the use of the vessel, until after libellant's cocoanut oil was discharged, and the samples taken.

Libellant calls attention to the following entry in the log book of the "Vermont" of June 15th, 1940:

"8 P.M. renewed nipple in vent
to #3 stbd in #2 hold
"12 noon calked Rivits and seams
in deep tanks."

and contends that these repairs included the rivets in the top of the double bottom tank, and the rivets of the stanchions to the top of the double bottom tank, and that it was done to hide defects therein, before a survey was had, of which notice had been given. The libellant is in error. I agree with Captain Cocks, claimant-respondent's expert, that the words "calked rivets and seams in the deep tanks", meant calked some of the rivets of the shell plating, or the seams of the deep tanks, and would have nothing to do with stanchions and had nothing to do with the top of the double bottom tank, as the caulking of any rivets in the top of the double bottom tank, or rivets of the stanchions thereto, would have been referred to, as having been done to the double bottom tanks, and not to the deep tanks.

The sides of the deep tanks, and seams therein, were not involved herein, and any caulking of rivets or seams therein, would not in any way, have affected the portion of the vessel to be surveyed.

The discharging of libellant's oil cargo was done by a company employed by the consignee, the libellant, and not by the "Vermont", or claimant-respondent, which company furnished pump and hoses, one of which hoses went into the deep tank, and one into a tank wagon. The same equipment was used for different types of oil, and was believed to be clean, but no witness was called, who had cleaned the equipment before this operation.

There is no evidence of anything other than the hose used in pumping out the cargo, being introduced into the deep tanks between loading and discharge.

■ Under the contract of carriage, the libellant was under the duty of discharging the cargo, and furnishing the equipment, and it was responsible for any damage suffered thereby.

■ The "Vermont" and the claimant-respondent used due diligence to make the "Vermont" and her deep tanks seaworthy, and clean, before the cargo was loaded.

The "Vermont" and the claimant-respondent were not guilty of any negligence.

Even if the oil taken from the bottom of the deep tanks was contaminated with fuel oil the S.S. "Vermont" and the claimant-respondent are not liable for any damage to the cocoanut oil in question.

A decree should be entered in favor of the "Vermont", and the claimant-respondent, against the libellant, dismissing the libel with costs.