GEORGE F. PETTINOS, Inc., v. AMERI-
CAN EXPORT LINES, Inc.

No. 59 of 1942.

District Court, E. D. Pennsylvania.

July 30, 1946.

Judgment Affirmed Feb. 26, 1947.

Conlen, LaBrum & Beechwood, of Philadelphia, Pa., for plaintiff.

Krusen, Evans and Shaw, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This suit is brought for damage to and shortage in two shipments of plumbago (graphite) from Colombo, Ceylon, to Philadelphia aboard the "Exbrook," one of 666 bags of dust plumbago and the other of 500 bags of lump plumbago.

Upon arrival in Philadelphia, a large number of the burlap bags containing the plumbago burst open in the process of unloading and were found to be rotted, particularly about the seams, from fresh water contact. After such bags as remained intact were landed (being about a third the whole number), the balance of the cargo was discharged in bulk and piled upon the pier. The bulk plumbago was rebagged sometime later and the entire lot weighed by United States Customs, with the result that a shortage in weight was reported.

The claim is (1) for the cost of rebagging and for other expenses incurred as a result of the breaking of the bags and (2) for the alleged short delivery. The loss occasioned by the breaking of the bags will be first considered.

■ The measure of a carrier's liability, as well as the burden of proof where the carrier's negligence is an issue, is fixed by the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304. No provision in a bill of lading can reduce the liability fixed by the Act or shift the burden of proof. Paragraph 17 of the bills of lading in this case, which states that "The carriers are not liable for * * * damage by * * * decay * * *" can not broaden the scope of the exception of Sec. 4, subsection (2) (m) of the Act, which is "Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods." The loss in this case does not come within this exception because the decay of the bags has not been shown to have been caused by any inherent defect or vice either of the plumbago or the burlap itself.

■ Section 4 of the Carriage of Goods by Sea Act establishes sixteen exceptions from liability. If the loss is caused by one of the enumerated exceptions, the carrier will not be held liable unless it appears that its negligence contributed to the damage, and the burden of proof upon that issue is upon the libellant. Subsection (2) (q) provides, in effect, that, as to loss due to causes other than the enumerated exceptions, the carrier can avoid liability only by showing that no fault or neglect on its part contributed to it. Here the burden is on the carrier. With these rules in mind the facts of the present case will be considered and, under them, the issue of the carrier's liability must be determined.

In the first place, it is undisputed that it was fresh, not salt, water which rotted the burlap bags. This eliminates all question of entry of sea water into the hold during the voyage.

■ Fresh water may get into the hold of a ship in a number of ways, chief among which are: rain through open hatches or uncovered ventilators, moisture present in the damaged shipment when loaded, moisture in other cargo stowed nearby, or sweat. As to all these possibilities, except sweat, the burden is upon the respondent to show freedom from negligence in any and all respects which might have caused or contributed to them. Sweat is a somewhat different matter and will be considered separately.

762

■ Since the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., the respondent does not have to show specifically the cause of the damage. The Vermont, D.C., 47 F.Supp. 877. In other words, in the present case, if the carrier shows due diligence in protecting these shipments, from moisture during the time they were in its hands, it is not bound to show how the moisture got into the bags.

The master of the ship and the first officer testified at length by deposition and I find nothing in their testimony to indicate lack of frankness or to furnish any reason why I should not accept it as true. So accepting it, it appears that no appreciable amount of rain water entered No. 2 hold, in which the plumbago was stowed, either through open hatches or through uncovered ventilators and that in these respects all due diligence was exercised. The measures taken for covering and protecting the hatches against the weather were fully described and were adequate.

The plumbago was stowed above a shipment of manganese ore and separated from it by two layers of dunnage and a heavy burlap cloth, over which were placed two more layers of dunnage. It was similarly separated from a shipment of jute fibre and tea above it except that tarpaulins were used in place of burlap. No wet cargo was stowed in No. 2 hold, which was separated from the adjoining holds by water-tight, steel bulkheads.

■ The libellant, in its brief, argues that the stowage was improper, citing an excerpt from a treatise on "Modern Ship Stowage" in which it is stated that "Usually jute contains a considerable amount of moisture * * *" and that "* * * Jute should not be stowed in the same compartment with goods that are * * * liable to be damaged by moisture." Without any testimony, expert or otherwise, in support of this opinion, it remains mere argument. With no opportunity for the respondent to controvert it or develop by cross-examination its source, applicability and limitations, it has no more weight than has the assertion in the respondent's brief that the stowage was proper. I must determine whether the carrier has met its burden from the facts as presented by the evidence. The only reference in the testimony to the qualities of jute is found in the deposition of the first officer which is in substance that jute is particularly *susceptible* to become moist, but less susceptible than burlap. However, as to the actual condition of the jute stowed in No. 2 hold, the same witness testified that, as a matter of fact, there was no noticeable moisture in it when it was loaded and that when it was unloaded there was no apparent moisture in it—a fact which he ascertained by feeling it with his hand. The jute, it is to be remembered, was separated from the plumbago by double dunnage and tarpaulins. I find as a fact that there was no negligence in the method of stowing the plumbago or in its location with respect to other cargo in the No. 2 hold.

■ Coming now to the question of sweat, its presence in the hold of a ship has been held to be a peril of the sea and consequently within the exception of Sec. 4, subsection (2) (c), of the Carriage of Goods by Sea Act. Even so, "the carrier remains liable if it fails to provide, without excuse, sufficient ventilation, or if its improper stowage contributes to the sweat, or if it is otherwise negligent in handling the cargo. Sweat, then, can be regarded as a peril of the sea only when all available and reasonable precautions are taken to avoid it." Wessels v. The Asturias, 2 Cir., 126 F.2d 999, 1000.

The ship's officers testified fully as to what was done on the voyage to avoid excessive sweat. Both were thoroughly experienced in carrying cargoes of plumbago, having made the run from Ceylon to this country with such cargo on many prior occasions.

No. 2 hold was provided with four ventilators of the ordinary type. So far as appears, this is enough for ventilation. They were kept, at all times, trimmed out of the wind and, although the libellant argues that this is an improper method of ventilating, the argument is unsupported by evidence. On the contrary the testimony of the officers is that the ventilators functioned to create a circulation of air in the hold, that sweat is a condensation of mois-

ture produced by going from a warm to a colder climate and that letting the cold air into the hold by turning the ventilators out of the wind is a "method used in familiar maritime practice" to control the amount of sweat and that, in manipulating the ventilators so as to keep the sweat down, they would be turned away from the wind instead of toward it. Further, so far as the ship's officers knew (and they stood no watches but were continuously on deck during the day), the ventilators were always kept properly trimmed.

The first officer testified that he made an inspection of the holds about once a week during the voyage, at which times the No. 2 hatch cover was removed. The master testified that the hatch covers were not removed during the voyage. This is not a serious inconsistency as the master may well have been testifying as to the general rule without considering the weekly inspections. The testimony of the master is that the cargo will not sweat unduly, even with the hatches closed, if the ventilators are kept trimmed out of the wind. For dry cargo the ventilation was adequate.

Entirely apart from the method of stowage and care of the cargo, the fact appears to be that there was no excessive amount of sweat at any time in No. 2 hold.

The master testified that on arrival at Boston the holds were absolutely dry.

No. 2 hold was provided with a cofferdam 42 inches in depth to take care of moisture arising from sweat and the testimony is that at no time was there any abnormal amount of water in it—never more than 9 inches, if I read the log correctly.

Part of the cargo in No. 2 hold consisted of more than 3000 packages of tea, a very perishable cargo, packed in wooden boxes and, like the plumbago, covered with burlap. It is a significant fact that on the discharge of the tea at Boston before reaching Philadelphia, it was found to be "100 per cent perfect." The burlaps covering the boxes of tea were not stained as they would have been had there been any undue amount of sweat or moisture in the hold.

Some sweat is inevitable on any ship. If no more than the inevitable amount of sweat occurs the carrier will not be liable since that amount is a peril of the sea. In this case it appears that reasonable precautions were taken to keep it down to the minimum, and I so find. If the rotting of the bags was due to such amount of sweat as there was in No. 2 hold—a fact which does not affirmatively appear— the ship would not be liable.

As has been said, the respondent is not bound to show how there came to be moisture in the burlap coverings of the bags. However, it would certainly have created doubt as to the adequacy of the protection of the cargo or of the credibility of the witnesses upon that point if it had been shown that there was no conceivable way in which the bags could become moist, other than by water entering the hold during the voyage. For this reason, and not because it constitutes proof of the fact, it is proper to say that it is at least possible that the plumbago had been wet before it had been put into the bags prior to loading. The bags when loaded were to all outward appearances dry but the sun was hot and the outside of the bags could have dried quite quickly leaving a considerable amount of moisture in their interiors. There is, of course, no proof that this was the fact but, on the other hand, the evidence does not force one to the conclusion that the moisture which caused the trouble entered the hold during the voyage.

■ I, therefore, find that the respondent has sustained the burden placed upon it, by the Carriage of Goods by Sea Act, to disprove negligence and, by the decision in Wessels v. The Asturias, supra, to show that all available and reasonable precaution had been taken to avoid sweat. I further find that there was no more sweat than is inevitable on such a voyage as the "Exbrook" made, and it is consequently a peril of the sea within subsection (c).

As to the alleged shortage: I hold (1) that the "Exbrook" received the amounts shown on the bills of lading at Colombo, Ceylon, and (2) that the libellant has not produced sufficient evidence to establish its claim for the shortage.

■ The bills of lading issued by the carrier contain the weights and description of goods together with the number of packages and the description of the packages in a column under the broad heading "Particulars Declared by Shipper." The respondent contends that this is not such a statement of the weight as to constitute prima facie evidence of it. I think, however, that it is.

■ The Carriage of Goods by Sea Act provides that a carrier shall issue to the shipper a bill of lading showing among other things the weight or quantity of the merchandise received and that, if it has reasonable grounds to believe the weight furnished by the shipper to be inaccurate, he may issue the bill of lading without showing the weight. The Act further provides that the weight shown on the bill of lading shall be prima facie evidence of the receipt of such weight and if the information furnished by the shipper is inaccurate, then the shipper shall indemnify the carrier against loss. One purpose of the Carriage of Goods by Sea Act was to enable the consignee to rely on the facts stated in the bill of lading. The provisions mentioned give the carrier ample opportunity to protect itself against any obligation to deliver more cargo than it has received. Having accepted the goods, the carrier may not avoid the prima facies of the bill merely by entering weight and quantity as "Particulars Declared by Shipper".

■ The libellant has not proved its claim for shortage. On that issue it had the burden of showing that the cargo was short when it was discharged from the ship, and also the amount by which it was short. When the plumbago came to be weighed by the United States Customs inspector, 19,450 pounds less than the weight given on the bills of lading was found. The only evidence of the date of the weighing is the date of the Customs certificate, which is January 3. According to the log, the ship cleared and left Philadelphia on November 9, seven weeks earlier. However, the date of the certificate may not be (and probably is not) the true date, because the bill from the Philadelphia Pier Co. for rebagging and storage was paid December 12, 1941. The rebagging and weighing, then, would appear to have been completed by December 6, and the weighing may have been soon thereafter, unless the plumbago was weighed in some other place after it had been rebagged and removed from the pier—a possibility not entirely excluded by the evidence. There is not sufficient evidence to resolve the question of the time of . weighing, which may have been anywhere from four to seven weeks after the cargo was discharged.

It appears that the plumbago was dumped upon the pier, where it remained, about two-thirds of it in the form of dust and lumps mixed together, until removed. The testimony shows exactly how it was piled. The intact bags were piled to make a sort of U-shaped parapet and the dust and lump plumbago from the broken bags was simply shovelled into heaps, part between the arms of the U and part outside of it.

■ From that time on there is absolutely no evidence to show how it was protected, if at all, and there is nothing to show what might or might not have happened to it before it was rebagged and weighed. I can find no testimony to indicate whether the pile was under cover or in the open. Nor is there anything to show who might have had access to it. Obviously, the plumbago was not weighed until it had been rebagged and there is no evidence as to the manner in which the rebagging was done or that some of it was not lost in rebagging. A substantial amount of the dust had worked into the material of the bags and may have been lost with the torn bags. Certainly it was incumbent upon the libellant to establish by evidence that what was weighed was in fact the quantity which was removed from the ship and that the rebagged plumbago represented the entire outturn of the cargo. This it might have done by showing the conditions under which the plumbago remained upon the pier and the precautions, if any, taken to protect it. I do not think that a libellant can recover for a shortage merely by showing that some considerable time after the cargo has been discharged its weight was less than it should have been. To hold otherwise, would put a carrier at the mercy of a consignee who might feel

free to leave a cargo where it was discharged until such time as was convenient for him to remove it, and in the meantime to let it remain under any conditions that best suited him, without regard to its preservation. The breaking of the bags, not being due to the fault of the ship, the libellant can not avail itself of that as an excuse for its failure to have the shipment promptly rebagged and weighed.