**MITSUI & CO., Plaintiff,**

v.

**M/V EASTERN TREASURE BARGE MV 6769, their engines, tackle, apparel, furniture, etc., in rem Liberian Dove Transports, Inc., Daiichi Chuo Kisen Kaisha Valley Line Company, Defendants.**

Civ. A. No. 76–2262.

United States District Court,
E. D. Louisiana.

March 6, 1979.

---

Cynthia Anne Wegmann, Philip A. Fant, New Orleans, La., for plaintiff.

Harvey G. Gleason, New Orleans, La., for defendant Daiichi Chuo Kisen Kaisha.

W. E. Noel, Richard B. Foster, New Orleans, La., for defendant The Valley Line Co.

James L. Schupp, Jr., New Orleans, La., for defendant Liberian Dove Transports, Inc.

CASSIBRY, District Judge:

This case involves the shipment of steel plates from Japan to New Orleans and on to Cincinnati. On or about July 27, 1974 Mitsui and Co. (Mitsui) shipped the steel from Japan to New Orleans aboard the M/V EASTERN TREASURE, which was owned by defendant Liberian Dove Transports, Inc. (Liberian Dove) and was under charter to defendant Daiichi Chuo Kisen Kaisha (Daiichi). There is no question that 183 pieces of steel were loaded onto the M/V EASTERN TREASURE in Japan, as indicated by the bill of lading issued by

Daiichi to Mitsui. Once in New Orleans, the cargo was transshipped onto Barge MV–6769, which was owned by defendant The Valley Line Company (Valley Line), for shipment upriver. When the cargo reached Cincinnati for unloading, however, there were only 181 pieces of steel. At issue here is who is responsible to Mitsui for the lost 2 pieces.

### The "Shipper's weight, load and count" clause

In New Orleans, the consignment of steel plates was discharged directly over the side of the M/V EASTERN TREASURE into Barge MV–6769. Valley Line issued a bill of lading reciting that Barge MV–6769 had received 183 pieces of steel. That bill of lading, however, contained a clause stating that the shipper, not the carrier, had loaded the cargo onto the barge and the quantity of the shipment was unknown to Valley Line.

The bill of lading issued by Valley Line is covered by the Harter Act, 46 U.S.C. § 190 *et seq.* That statute provides that the bill of lading shall be "prima facie evidence of the receipt of the merchandise therein described." 46 U.S.C. § 193. Under this provision, then, the burden would shift onto Valley Line to show that its barge did not in fact take on 183 pieces of steel.

Valley Line argues that because of the insertion of that clause in its bill of lading, the burden should not so shift. The clause reads:

> . . . the said shipment has been loaded by the shipper and the contents, quality, quantity, and condition of the shipment and the packages, if any, are unknown.

Valley Line claims that this clause is a "Shipper's weight, load, and count" clause, allowed under the Pomerene Act, 49 U.S.C. § 81 *et seq.* Valley Line's bill of lading was issued for the transportation of goods between two states, and was therefore covered by that Act. 49 U.S.C. § 81. Section 101 of the Pomerene Act allows carriers to insert in bills of lading the words "Shipper's weight, load, and count"—or words of similar purport—indicating that the goods were loaded by the shipper, not the carrier. If this statement is true, the bill of lading is *not* prima facie evidence of receipt by the carrier of the goods described in the bill of lading. Rather, the shipper must produce other evidence to this effect. Under § 101,

> . . . a bill of lading containing the recital "shipper's load and count" places the burden of proof of proper and correct loading upon the shipper, and such bill of lading without additional evidence does not fulfill this burden.

*Dublin Co. v. Ryder Truck Lines, Inc.*, 417 F.2d 777, 778 (5th Cir. 1969).

■ The clause in Valley Line's bill of lading does fall under § 101 of the Pomerene Act, since its meaning is the same as if it had simply recited "Shipper's weight, load, and count."

Only if the recitation is true will the clause have the evidentiary effect outlined above. There is some question in the instant case as to whether the steel was in fact loaded onto Barge MV–6769 by the "shipper," as that term is used in § 101 and the clause in Valley Line's bill of lading. Mitsui was the party that sent the steel to the United States, thus it would conventionally be called the "shipper" in this transaction. Daiichi contends that Mitsui should be considered the "shipper" for purposes of § 101 and the bill of lading. It points out that T. Smith and Son, Inc. (T. Smith), the stevedore, did the actual loading of the steel onto the Valley Line barge in New Orleans. Thus, argues Daiichi, the steel was never loaded onto the barge by the "shipper" within the meaning of § 101 and the recitation in Valley Line's bill of lading.

■ Daiichi cites *Carrier Corp. v. Furness, Withy & Co.*, 131 F.Supp. 19 (E.D.Pa. 1955) in support of its position. That case held that because the stevedore that loaded a barge was not the actual agent of the conventional shipper, the barge was not loaded by the "shipper" for purposes of the Pomerene Act. It seems that the statute does not deserve so technical a reading. It

intends to distinguish two fundamentally different situations—that where the carrier itself actually does (or hires someone to do) the loading; and that where someone other than the carrier, authorized and paid by the shipping interests, does the loading. The former situation is loading "by a carrier" within the coverage of § 100 of the statute; the latter is loading "by a shipper" under § 101. Under my reading of the Pomerene Act, then, the steel in the instant case was surely loaded by the "shipper."

In the instant case, moreover, T. Smith qualifies as the agent of the conventional shipper, Mitsui, and so even the *Carrier Corp.,* standard is satisfied. In *Carrier Corp.,* the court found that neither the stevedore nor the ship's agent ever had any communication with the shipper or the shipper's agent. Here, Mitsui's agent, M. G. Maher & Co., issued a Delivery/Release Order directing that the steel be transferred by the ship to Valley Line's barge. Once Valley Line received this document, it began to prepare to receive the steel. It stayed in touch with the ship's agent, Fritz Maritime, and as the date for transshipment approached, Valley Line stayed in touch with the stevedore, T. Smith. With regard to the transshipment, there was obviously a chain extending from Mitsui and its agent, to the ship and its agent, and to the stevedore. As Mr. Hote, Fritz Maritime's manager, testified, the cost of retaining the stevedore is built into the ship's contract with the shipper.

Accordingly, for purposes of § 101 of the Pomerene Act, the steel was loaded onto Barge MV–6769 by the "shipper." The clause in Valley Line's bill of lading is thus true insofar as it makes this assertion and states that the quantity of the shipment therefore was unknown to the carrier.

Valley Line argues that since the clause's statement is true, the bill of lading should not be prima facie evidence of Valley Line's receipt of 183 pieces of steel. Daiichi and Liberian Dove argue that the Pomerene Act should not be allowed thus to contradict the Harter Act.

There are no cases squarely on point. The few cases that relate to the problem support the position of Daiichi and Liberian Dove. *Mississippi Valley Barge Line Co. v. Inland Waterways Shippers Association,* 289 F.2d 374 (8th Cir. 1961) concerned the carrier's liability for damage due to faulty loading of a barge by a shipper. The bill of lading contained several exculpatory clauses, and contained a "Shipper's weight, load, and count" provision. The court held that the carrier could not relieve itself of its legal duty to handle and stow the cargo carefully, all these clauses notwithstanding. The issue before the court in the instant case is much narrower, for it concerns merely how the "Shipper's weight, load, and count" clause affects the burden of proof on the factual issue of how much cargo the carrier took on board. That issue was before the court in *George F. Pettinos v. American Export Lines,* 68 F.Supp. 759 (E.D.Pa.1946), aff'd 159 F.2d 247 (3d Cir. 1947). The case involved the Carriage of Goods by Sea Act (COGSA), which covers shipping between this country and foreign ports. The court held that under COGSA a carrier "may not avoid the prima facies of the bill [of lading] merely by entering weight and quantity as 'Particulars Declared by Shipper.'" 68 F.Supp. at 764. However the court never mentioned the Pomerene Act and the possible legitimizing influence it might have on the carrier's "Shipper's weight, load, and count" clause.

COGSA, however, specifically retains the provisions of the Pomerene Act insofar as they affect the legal significance of ocean bills of lading. Section 1303(4) of COGSA provides:

> . . . a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described . . . *Provided,* That nothing in this chapter shall be construed as repealing or limiting the application of any part of sections 81 to 124 of Title 49 [the Pomerene Act].

The effect of § 101 of Title 49 with respect to "Shipper's weight, load, and count" clauses has been discussed above. Thus, COGSA specifically allows an ocean

carrier to defeat the prima facie effect of its bill of lading by inserting such a clause into the bill.[1] It seems most incongruous for an inland maritime carrier covered by the Harter Act not to be able to provide itself the same protection. The two carriers would then be under different evidentiary burdens with regard to goods which they receive under substantially the same circumstances.

■ Congress' actions in this area have deliberately avoided that result. In the Harter Act, Congress explicitly allowed a carrier to indicate in its bill of lading that the shipper weighed the cargo, although that phrase had no effect on the prima facie effect of the bill. 46 U.S.C. § 193. The Pomerene Act was passed after the Harter Act. It declared in § 101 that "Shipper's weight, load, and count" clauses were, indeed, to have special exculpatory effect. Congress knew that the Harter Act explicitly allowed such clauses. If it had meant to except such clauses in Harter Act bills of lading from the operation of § 101, it would have carved out an exception to that section. It did not do so, thus § 101 will extend to Harter Act bills of lading. Indeed, in passing COGSA Congress demonstrated its awareness of the necessity of specific exceptions in subsequent statutes. Section 1303(4) of COGSA establishes the broad prima facie effect of COGSA bills of lading. Congress took specific care to retain the Pomerene Act insofar as it affects this aspect of COGSA bills of lading. It thus recognized that if it had not done so, the terms of the subsequent statute would have controlled. Accordingly, Congress has consistently acted to allow § 101 of the Pomerene Act to modify the legal effect that bills of lading would otherwise have under the Harter Act and COGSA.

### The evidence

Valley Line's bill of lading thus is not prima facie evidence that the barge accepted 183 pieces of steel. However, at the trial Daiichi and Liberian Dove produced other evidence to this effect, namely, the testimony of the checker who recorded the transshipment of steel between the M/V EASTERN TREASURE and Barge MV–6769. Robert Cross actually counted 183 pieces of steel being transferred from the ship to the barge. He made a credible witness. He noted that the thickness of the steel plates at issue here made them particularly easy to count. He noted also that the difference in length between the consignment of steel at issue here and the next consignment made it clear where one cargo ended and another began.

Valley Line attempted to show that the plates could not have left the barge at any time before the plates were unloaded and counted short in Cincinnati, thus Robert Cross' testimony should not be accepted. However, Valley Line could only produce direct evidence to the effect that the barge remained unopened until the fleet of which it became a part began to be towed upriver. It did establish that heavy equipment would be needed to open the barge, but it did not adequately negate the possibility that such equipment was employed somewhere along the Mississippi River after the M/V W. J. BARTA began to tow the fleet upriver and before the fleet reached Cincinnati.

The only evidence concerning that part of Barge MV–6769's journey was the logs of the two tugboats that brought the barge upriver. These logs, however, cannot stand as a definitive statement of everything that happened on the voyage upriver. They do not let me reconstruct the voyage sufficiently to conclude that there was no opportunity for the steel plates to have been lost from the Barge MV–6769. Indeed, the logs indicate that the fleet was stopped occasionally. Once Barge MV–6769 was exchanged between the M/V W. J. BARTA and the M/V VALLEY VOYAGER. Even more important, there is a very real possibility, not at all negated by any other evidence, that there were stops or incidents not reported in these logs. The nature and comprehensiveness of the information that is

---

1. The *George F. Pettinos* case, *supra*, reaches a contrary result. However, that case completely ignores the effect of § 101 of the Pomerene Act.

supposed to be recorded in these logs has not been explained to me. Moreover, I have no basis upon which to evaluate the credibility of the persons who made these reports.

■ In light of the strong, direct testimony of Robert Cross that all 183 pieces of steel were put in Barge MV–6769, I find that the preponderance of the evidence establishes that the loss here occurred while the steel was in the custody of Valley Line. *See United States v. Louisville & Nashville R.R. Co.,* 389 F.Supp. 250 (M.D.Ala.1975).

■ This question of proof is obviously a close one. However, I could under no circumstance find that the evidence preponderates in favor of Valley Line. If I did not find it more likely than not that the loss of the steel plates occurred while the shipment was in the custody of Valley Line, I would be forced to declare the evidence inconclusive on this question. This being so, liability would still fall on Valley Line, for the principle that "where goods pass through the hands of successive custodians, in apparent good order, any loss is presumed to have occurred while they were under the control of the last custodian" would come into play. *Julius Klugman's Sons, Inc. v. Oceanic Steam Navigation Co., Ltd.,* 42 F.2d 461, 462 (S.D.N.Y.1930); *Robert Bradenhop Corp. v. N.V. Knoinklijke P. M.,* 1960 A.M.C. 2114, 2116 (S.D.N.Y.1960).

Notice to the ocean carrier

■ Daiichi and Liberian Dove urge an alternative basis upon which Valley Line should bear liability for the loss in the instant case. The statute controlling the ocean carriage by Daiichi from Japan to New Orleans is COGSA. Section 1303(6) of that statute provides:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

The port of discharge of the steel from the ocean carrier was New Orleans. Valley Line was the party entitled to delivery thereof at that stage. Valley Line had been designated, in the Delivery/Release Order of Mitsui's agent, as the party to whom Daiichi should release the steel. Valley Line, however, did not give the ocean carrier, Daiichi, the notice required by § 1303(6). The Requests for Admissions propounded by Liberian Dove, and the lack of proper answer or objection thereto, establish these facts. F.R.Civ.P. 36(a). Section 1303(6) therefore dictates that, between these two parties, removal of the steel by Valley Line is prima facie evidence of delivery by Daiichi of 183 pieces of steel. *See Miami Structural Iron Corp. v. CIE Nationale Belge de T.M.,* 224 F.2d 566 (5th Cir. 1955); *Otis McAllister Export Corp. v. Grancolombiana (New York), Inc.,* 216 F.Supp. 756 (E.D.La.1963). Valley Line's evidence, according to the analysis above, is insufficient to rebut such a prima facie case.

The "Shipper's weight, load, and count" clause does not destroy the prima facie case created under this provision of COGSA. It is § 1303(4) of COGSA that retains the Pomerene Act. The provision of COGSA establishing a prima facie case due to lack of notice of loss or damage is a separate subsection, § 1303(6).

For the foregoing reasons, there should be judgment in favor of plaintiff Mitsui against defendant Valley Line. The stipulated amount of damages is $2,960.60.